UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICIA MORRIS-GIBSON, an individual

     PLAINTIFF,                       Case No.:
                                            Hon.

v.

THE INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA (UAW), GERALD KAREEM,
MIGUEL FOSTER AND GEORGE HARDY,

     DEFENDANTS.
_____

AVERY K. WILLIAMS (P34731)
LISA M. GARDNER (P54971)
WILLIAMS ACOSTA, PLLC
Attorneys for Plaintiff
535 Griswold, Suite 1000
Detroit, MI 48226
(313) 963-3873
awilliams@williamsacosta.com

GERALD K. EVELYN (P29182)
Attorneys for Plaintiff
535 Griswold, Suite 1000
Detroit, MI 48226
(313) 962-3500
geraldevelyn@yahoo.com
_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Patricia Morris-Gibson ("Plaintiff"), by her attorneys, Williams

Acosta, PLLC and Gerald K. Evelyn, states as follows as her Complaint against

Defendants, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), Miguel Foster ("Foster"), George Hardy ("Hardy"), and Gerald Kareem ("Kareem") (collectively "Defendants"):

## <u>NATURE OF THE COMPLAINT</u>

1.      In this civil action, Plaintiff asserts claims for money damages in excess of $75,000.00, and requests punitive damages, attorney fees, costs and all other available relief under law based on Defendants' unlawful discrimination of Plaintiff and the hostile work environment to which she has been subjected.

2.      The claims asserted by Plaintiff in this action include, but are not necessarily limited to, violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000(e), *et seq.,* the Michigan Elliott Larsen Civil Rights Act, MCL 37.2201, *et seq.*, and common law for the sexual harassment of Plaintiff and hostile work environment to which Plaintiff was subjected that was so severe or pervasive that it altered the conditions of her employment; as well as breach of the UAW's policy on the Elimination of Workplace Sexual Harassment. (Exhibit 1)

## <u>PARTIES</u>

3.      Plaintiff is an individual who resides in the City of Taylor, Michigan, within the Eastern District of Michigan.

4.      Plaintiff, a 56-year-old African American female, is employed with the UAW as an International Service Representative.

5.      The UAW is a labor organization whose offices are located in Detroit, Michigan, within the Eastern District of Michigan.

6.      Defendant Miguel Foster is the UAW's Assistant Director of Technical Office Professionals ("TOP") who was Plaintiff's immediate supervisor, and who resides within the Eastern District of Michigan.

7.      Defendant Gerald Kareem ("Kareem") is the Vice President and Director of the UAW Ford Department and, upon information and belief, resides and has done work within the Eastern District of Michigan.

8.      Defendant George Hardy is the UAW's Assistant Director of Independent Part Suppliers ("IPS") and, upon information and belief, resides within the Eastern District of Michigan.

## JURISDICTION AND VENUE

9.      Jurisdiction is vested in this Court under 28 U.S.C. § 1331 and 42 U.S.C § 2000(e), *et seq.*

10.    Jurisdiction is further vested in this Court under 28 U.S.C. § 1367.

11.    Venue is vested in this Court under 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

12.    Plaintiff's employment with the Blue Cross Blue Shield ("BCBS") division of the TOP Section of UAW began in 2008.

13.    Plaintiff has worked as a union leader for over twenty-two (22) years and she has been a union member for over thirty-three (33) years.

14.    Plaintiff came to work for the UAW International by selection by its leadership.

15.    Plaintiff was repeatedly told that she served at the discretion of the UAW's leadership.

16.    Plaintiff was made aware by members of that leadership that if they became unhappy with her, she would be demoted to her last non-union leadership position with the same salary and benefits.

17.    Throughout her employment with the UAW, Plaintiff was subjected to discrimination and sexual harassment including but not limited to unwelcome sexual advances, comments, and offensive conduct of a sexual nature.

UAW CONTRACTUAL POLICY

18.    UAW adopted and implemented a policy on the Elimination of Workplace Sexual Harassment that is detailed and binding.

19.    The policy is unambiguous and guides UAW's commitment to prevent and eradicate sexual harassment.

20.    The language of the policy is plain and unambiguous.

21.    The policy provides, among other things as follows:

**[a.] DEFINITION OF SEXUAL HARASSMENT**

Sex-based harassment may be unwanted attention directed to an employee because of their sex. Equal Employment Opportunity Commission (EEOC) guidelines stress that sexual harassment can be verbal abuse as well as unwanted physical contact or offensive pictures, cartoons, slogans or posters displayed in a work area:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Recent court decisions also have recognized that sexual harassment can occur in many different ways. A worker need not be propositioned, touched offensively or harassed by sexual innuendo.

In some sexually charged workplaces, proving the "unwelcomeness" of the harassment activity is complicated by the behavior of the complainant. Mixed signals may indicate the complainant is showing welcomeness, while in fact, the employee's behavior is simply an effort to adjust to the prevailing workplace culture. Under the law, conduct that is initially welcomed, may later become unwelcome. An employee's initial acceptance does not waive their right to complain about later conduct, but the initial acceptance may complicate any attempt to prove unwelcomeness.

There are at least four types of victims of sexual harassment: 1) those who are penalized for refusing the harasser's advances; 2) those whose fear of reprisal or desire for privileges traps them in unwanted sexual relationships; 3) workers who suffer as a result of the harasser's favoritism toward one of them who does submit to sexual advances; and 4) everyone who is required to work in an

5

environment tainted with hostile or offensive language, behavior or visual displays.

**** 

### [b.] SPECIAL PROTECTION AGAINST SEXUAL HARASSMENT

In addition to grievances on sex discrimination, additional efforts can be made through collective bargaining to eradicate sexual harassment. Since 1979, the problem of sexual harassment has been brought to the bargaining table for frank and open discussion with management. Contractual language was won at Chrysler, Ford, and General Motors which identifies sexual harassment as a subject within the jurisdiction of the National and Local Equal Application Committee, In 1996 letters, these auto employers agreed that discrimination because of sexual orientation could be grieved the same as other types of improper discrimination.

The International Union encourages the development of special complaint provisions to address the problem of sexual harassment, as long as such provisions offer an additional avenue of relief, rather than a substitute for the grievance procedure and can be applied equally to all UAW members.

**** 

### [c.] REMEDIES FOR SEXUAL HARASSMENT

The remedy for a victim of sexual harassment depends on the particular case. For example, if the grievant has suffered economic harm (e.g., demotion, suspension, discharge) due to retaliation by a supervisor for the employee's failure to submit to the supervisor's advances, the requested remedy should include the standard "make whole" demand. On the other hand, if the grievance is directed at stopping harassment, the requested remedy should at least demand that the supervisor cease and desist the objectionable conduct. It can also request that the supervisor be transferred or disciplined up to and including discharge and that the company fulfill its duty to provide a workplace free of sexual harassment.

Other forms of relief or grievance settlement may include a demand that management print, distribute and post a policy against sexual harassment in the workplace. This demand can also be pursued during contract negotiations.

6

**\*\*\*\***

**[d.]  CONFIDENTIALITY**

A sexual harassment complaint is a very sensitive topic and must be handled with great seriousness and respect for the rights of all concerned. Sometimes workers are too embarrassed or humiliated by the experience to come forward with their complaints. This problem can only be corrected if workers feel assured that the Union will take their complaints seriously and will treat them as confidential as possible.

Of course, the filing of a grievance on sexual harassment means that the complaint will not be totally secret forever. However, the substance of the grievance can determine how much detail must be revealed to management or how prominent a role the individual victim must play. For example, the committeeperson may wish to file a union policy grievance or group grievance when the aim of the grievance is to stop a harasser's conduct and no economic award for an individual grievant is sought. The names of the alleged harasser and victim(s) should be included in the grievance in order for it to be properly investigated. As with any other grievance, supporting facts should be released on a "need to know' basis only and be kept confidential. This will decrease the probability that anyone will file a defamation suit.

22.     Despite having a well-defined policy of prohibition of sexual harassment, Defendants breached the policy in every fashion imaginable as detailed below.

23.     Despite having a road map to guide their conduct and response in situations involving sexual harassment, Defendants chose to openly flaunt the policy in order to retaliate against Plaintiff and maintain and perpetuate a pervasively hostile work environment.

## A. HARASSMENT BY MIGUEL FOSTER

24.     During Plaintiff's first week on staff with the UAW, Defendant asked another co-worker (Kevin Tolbert) who is that "woman with the big titties and the small waist".

25.     While attending a Coalition of Black Trade Unionists Convention in Atlanta, Georgia, Foster, who was Director of the Civil and Humans Rights Department, asked Plaintiff to sleep with him.

26.     Foster told Ms. Angela Blue, a retired International Representative that he loved ["Plaintiff"].  Ms. Blue relayed this comment to Plaintiff, but it was never investigated by Defendants.

27.     When Foster joined Plaintiff's division in 2018, he almost immediately began harassing behavior toward Plaintiff.

28.     Foster made comments about bending Plaintiff over her desk and tapping "that ass" in front of a co-worker Anthony McNeil.

29.     McNeil was visibly upset about Foster's comment and later told Plaintiff that "if Miguel said one more thing to [her], he would check him because he has sisters and wouldn't allow anyone to disrespect them like that."

30.     Foster asked Plaintiff to "have his babies".

31.     Foster stated to Plaintiff and co-workers that Plaintiff was "his type of woman".

32.     Sandra Parker witnessed Foster's constant harassment toward Plaintiff and another co-worker. Parker expressed disapproval and frustration to Plaintiff about Foster's conduct, and then proceeded to contact Scott Andrews (Staff Council President) to discuss Foster's behavior.

33.     Plaintiff repeatedly requested Hardy to assign her to a different line of business, as Foster was over TOP, the line of business she was under. Hardy frequently responded that he was working on it, yet Plaintiff remained under Foster's leadership.

34.     On or about October 2018, as Plaintiff was exiting an elevator at BCBS, Foster shockingly kissed Plaintiff on the side of her mouth without her consent or permission.

35.     This incident was witnessed by others including the president of the BCBS local union, Amy Castanon.

### B. HARDY ALLEGED INVESTIGATION

36.     In October 2018, Plaintiff relayed the facts of BCBS "kiss incident" to her co-worker, Darryl Bragg, who reported the incident to Hardy, the then Director of TOP Department and Plaintiff's ultimate supervisor.

37.     Foster was never properly interviewed by the UAW.

38.     Plaintiff's complaints have always been treated as mere puffery and exaggeration by Defendants, who devoted their energy to "protecting Foster."

39.     The next day, Hardy summoned Plaintiff from (Sandra Parker) her union representative's office, into a meeting in Foster's office with him, Foster and Darryl Bragg. Plaintiff's union representative was not asked to attend.

40.     During the meeting in Foster's office, Hardy commented about them being a family and proceeded to ask Plaintiff about Foster kissing her on the elevator.

41.     Plaintiff was uncomfortable and asked Hardy if she could leave the meeting, but Hardy denied her request demanding that she talk about the kiss on the elevator in Foster's presence in direct contravention of the UAW's policy. (See Exhibit 1 and ¶ 17, p. 18 above).

42.     Plaintiff confirmed to Hardy that Foster kissed her when she was exiting the elevator.

43.     Hardy asked Plaintiff whether she was offended by Foster kissing her and Plaintiff denied being offended in an effort to shorten the discussion so that she could leave the meeting, which had made her extremely uncomfortable as Foster was visibly angry and noticeably glaring at her and was still her supervisor. (See Exhibit 1) Plaintiff became visibly upset and began crying and hyperventilating, as she was afraid and humiliated.

44.     When Plaintiff left the meeting in Foster's office, Hardy's secretary, Barbara Hoyles, noticed that Plaintiff was visibly upset. Hoyles approached Plaintiff, hugged her and told her "everything would be okay".

10

45.     Sandra Parker, Plaintiff's union representative, also saw that Plaintiff was visibly upset after leaving Foster's office and went to Plaintiff's office. Parker indicated that Hardy should have asked her to attend the meeting with Plaintiff.

46.     After Parker left Plaintiffs office, she went to Hardy's office and asked Hardy why he did not bring her (Parker) in as her Union Representative. Hardy told Parker he did not bring her (Parker) into the meeting because he thought that Bragg was lying.

47.     Hardy asked Nadja Riovos ("Riovos"), the Assistant Director of Arbitration, if she thought his conduct was appropriate. Riovos informed Hardy that Plaintiff was upset and could not stop crying after the meeting in Foster's office and that he should have taken the complaint regarding sexual harassment to human resources.

48.     Hardy replied that he could not worry about "Patricia Morris and her tears because he must protect Foster" and keep it in the department.

## C. JEFF SHROCK'S SECOND ALLEGED UAW INVESTIGATION

49.     After the Hardy meeting, upon Plaintiff's return from medical leave, Foster began to retaliate against and attempt to intimidate Plaintiff.

50.     The UAW did not investigate Plaintiff's allegations of sexual harassment until April 2019, after Plaintiff requested her personnel file and the IME findings, and six months after Hardy was informed of the harassment.

11

51.     Plaintiff met with Jeff Shrock ("Shrock"), AA to then UAW president, Gary Jones, and Scott Andrews ("Andrews"), Staff Council President.

52.     Plaintiff met with Andrews two days before the UAW disclosed their findings. Plaintiff asked if Castanon, who witnessed Foster kiss Plaintiff on the elevator, was asked to give a statement for the case. Andrews informed Plaintiff that Defendant deemed it unnecessary to bring an outsider in, as Foster admitted to kissing Plaintiff.

53.     After the investigation, Plaintiff met with Shrock, Andrews and the human resources director, Naghmana Siddiqi, to discuss the UAW's findings.

54.     During the meeting with Shrock, Andrews and Siddiqi, Plaintiff was informed of the following:

    a.  Foster admitted to kissing Plaintiff;

    b.  Foster admitted to unwanted advances and inappropriate behavior toward Plaintiff;

    c.  Foster and Plaintiff were expected to be professional and "get back to work";

    d.  Plaintiff could move to the security guard's office if she did not want to sit near Foster, which was five doors away from Foster and half the size of her prior office;

    e.  Plaintiff was told if she saw Foster coming, she could turn the other way;

    f.  Plaintiff could come in early and leave late to avoid Foster;

g. If Plaintiff needed copies from the print room, she could ask a secretary to retrieve the copies to avoid Foster;

h. Plaintiff must remain professional when she encounters Foster in staff meetings, departmental meetings, conferences and conventions;

i. Plaintiff was told by Jeff Shrock that President Jones said she had no choice but to see Foster in meetings, conferences and conventions and when she saw him, she had to be professional;

j. Plaintiff was told that Foster was a needed (essential) employee;

k. Plaintiff was never interviewed by Human Resources. She was interviewed by Hardy who said he had to protect Foster and Jeff Shrock, Foster's friend and Administrative Assistant to Gary Jones; and

l. Plaintiff was told by Andrews that she could use the Employee Assistance Program and go back on medical leave, with which Siddiqi agreed; and

m. Andrews asked Shrock if Foster received direction regarding interactions with the Plaintiff. Shrock said no, under the order of Gary Jones.

55.   The UAW's corrective action in response to the complaint of sexual harassment of Plaintiff was to assign Plaintiff to a department where she reported to her harasser Miguel Foster, again.

56.   After Plaintiff returned from her initial medical leave in March 2019, Plaintiff was ordered to attend a UAW gathering at Cobo Hall.

57.   During Plaintiff's first session at this gathering, Foster approached Plaintiff and said their new boss Joe Rioux wanted to meet with the two of them.

58.    Foster motioned for Plaintiff to follow him and took her on a meandering path down a dark hallway behind the stage into the Sergeant at arms room.  Plaintiff believed she was compelled to follow Foster despite her discomfort.

59.    Plaintiff was petrified the entire time of this solitary journey but believed that the meetings with Shrock and Hardy left her no options.

60.    There was another incident in March 2019 when the Solidarity House lost power.

61.    The employees were sent home.

62.    Plaintiff was in a copy room when the power went off and it went dark.

63.    As Plaintiff exited the copy room, Foster jumped out scaring Plaintiff and started to shadow box with Plaintiff.

64.    Foster then said to Plaintiff: "Oh it's you", popped his collar and ominously said, "you better be careful".

## D. FIRST UAW FORMAL RESPONSE

65.    Plaintiff was so upset that she was unable to continue working and went on a medical leave in October 2018.

66.    The UAW's response to Plaintiff's complaint has been nothing short of horrendous and utterly non-responsive to Plaintiff's concerns and the intolerable working conditions in which she found herself.

67.     Plaintiff was forced to undergo at least two allegedly independent medical examinations.

68.     Plaintiff first went on forced medical leave in October 2018.

69.     She was forced into a medical examination with a clinician, James Cowley, MSU, LCSW, who was a mental health therapist on October 4, 2018.

70.     Plaintiff was sent for an IME by Defendants in February 2019 with Gerald A. Shiener, M.D. after Cowley had already released her to return to work as of March 11, 2019. Eventually the Defendants received Shiener's findings which included a return to work date of March 14, 2019.

71.     After receiving no communication from Shiener, Plaintiff communicated to Siddiqi (via email) that Cowley released her to return to work on March 11, 2019. Siddiqi informed Plaintiff that Shiener also had not communicated with her, and that Plaintiff could return per Cowley's findings.

72.     Plaintiff asked her therapist to allow her to return to work after being informed of Hardy's demotion and that she would be under a new Director, Joe Rioux.

73.     Plaintiff returned to work on March 11, 2019, after convincing Cowley, her therapist, to allow her to return to work, not based on the IME findings.  She returned, as she wanted to keep the job and position that she had earned through hard work and sacrifice.

74.     Upon her return to work, Plaintiff was still assigned to work with and report to Foster until the next divisional staff meeting.

75.     In fear of being alone with Foster, Plaintiff asked Bragg and McNeil to enter her office if they saw Foster come into her office.

76.     Plaintiff was called to a private meeting with Hardy, Foster and Rioux, in which Plaintiff supplied them with alternative departments in which she could work, at Rioux's request.

77.     Plaintiff's recommendations were disregarded in the course of a meeting with her division that was chaired by Mr. Rioux. Plaintiff was again assigned to work with and report to Foster.

78.     Plaintiff protested the reassignment to Foster to Mr. Rioux during the meeting.   Her protests were ignored.

79.     Plaintiff was visibly upset after the divisional meeting. Hardy called Plaintiff into his office to inform her that Rioux expressed disapproval about her response and frustration over her questioning his authority, leaving Plaintiff feeling defeated.

80.     Plaintiff requested a copy of her personnel file and the IME report.

81.     Defendants initiated an investigation of Plaintiff's sexual harassment allegations only after Plaintiff requested her personnel file and IME report.

82.     Plaintiff was relocated to a smaller office on the same floor with Foster.

16

83.    Plaintiff began working with her door locked, her lights off and her blinds closed as a result of fear and stress driven by the fact that Foster knew she was in the office and probably alone.

84.    Plaintiff later learned that Shiener's IME report included confidential healthcare information in violation of HIPAA.

85.     Shiener's report was biased and clearly structured to minimize Plaintiff's complaints.

## E.  SECOND UAW IME

86.    After her meeting with Shrock and others and the UAW's unsatisfactory response to her complaints, Plaintiff's conditions continued to worsen.

87.    Plaintiff went out on medical leave a second time.

88.    Plaintiff has been off work since April 2019.

89.    Plaintiff's salary and benefits have been systematically reduced by Defendants.

90.    Plaintiff's car allowance was reduced along with multiple other benefits, her auto insurance reimbursement, her monthly communication allowance, her oil change maintenance reimbursement, her life insurance policy and her dependent life insurance.

91.    Plaintiff is a mother of a college-aged daughter, and she cared for her own mother, prior to her failing health and subsequent passing

92.    Plaintiff was married, but her marriage disintegrated once her husband became aware of Foster and Settle's harassment.

93.    Plaintiff's salary was dramatically cut in the midst of the global pandemic in April 2020.

94.    Plaintiff was sent for a second IME in September 2019, with David Beltzman, M.D., a Board-certified psychiatrist.

95.    Plaintiff was diagnosed with major depression and Post-Traumatic Stress Syndrome by Dr. Beltzman as a result of Defendants' harassment. Plaintiff was also diagnosed with major depression, PTSD and paranoia disorder by Cowley, her psychiatrist and her medical doctor, which she is currently being treated for.

## F.  HARASSMENT BY GERALD KAREEM

96.    While at a conference in Washington, DC, Kareem whispered in Plaintiff's ear asking her to sleep with him and said it would be their little secret.

97.    Plaintiff responded that she was married.

98.    Kareem laughed and said that he would not tell.

99.    On or about March 12, 2019, while at a bargaining conference at the TCF Center, Kareem approached Plaintiff and said to her "Goddamn you so fucking fine".

100.   Kareem nicknamed Plaintiff 'cousin' because he stated that Plaintiff reminded him of his beautiful cousin.

101.   Kareem informed one of his employees of his interest in Plaintiff, which the employee relayed back to Plaintiff.

## G. OTHER INCIDENTS OF HARASSMENT

102.   Plaintiff was subjected to numerous unwelcome and offensive comments and conduct by Jimmy Settles, former UAW Vice President of the Ford Motor Company Department.

103.   Plaintiff first encounter with Settles (then, a Regional Director) was at a conference in Atlanta. Settles was very intoxicated and inquired about Plaintiff name from Reggie Mills (then, a CommitteeMan). Settles then belligerently screamed Plaintiffs name across a hotel lobby, insisting that she come over to him.

104.   While talking to Plaintiff at the Macy's Bar at the UAW Black Lake Conference Center, Settles ran his hand across her stomach and asked if he could "have some".

105.   During a meeting with Rory Gamble ("Gamble"), current UAW President, Settles called Plaintiff into the meeting to bring Gamble a bottle of water. Upon entering the meeting, Settles made a comment to Gamble regarding Plaintiff's "hard nipples showing through her shirt" and that "she must be happy to see you".

106.   After the meeting, Settles told Plaintiff that Gamble was so excited to have seen her, that he stuttered the rest of the meeting. From that moment forward, Plaintiff is reminded of that experience, and was embarrassed every time she saw Gamble.

107.   Plaintiff was embarrassed by Settles' comment and Gamble told Settles to "leave her alone".

108.   During a conversation with Plaintiff and Angela Blue ("Blue"), a former international union representative, Settles told Plaintiff he would buy her a pair of red bottom shoes (Christian Louboutin's) if she was wearing them and had them hanging out of his desk drawer.

109.   Settles informed Plaintiff that Blue would not become the Director of Civil Rights because she was too old and grey, and had missing teeth, in response to why he rejected Plaintiff and Blue's request to transfer to the Civil Rights Department.

110.   Settles requested that Plaintiff bring "pretty friends" to his annual golf outings.

111.   During a Christmas party held at the National Program Center, in the presence of his staff, Settles insisted that Plaintiff sit on his lap and when she refused, he grabbed Plaintiff by the ponytail and pulled her in an attempt to get her chair to his chair. When she got free from his grasp, Settles grabbed the back of her shirt,

and ripped it in an attempt to keep her from getting away. Plaintiff was humiliated and embarrassed.

112.   Frank DiGiorgio or Frank Keates, formerly Settles' administrative assistants, apologized for Settles' behavior and told Plaintiff "Jimmy didn't mean it; he was drunk and would regret it later".

113.   When Plaintiff decided to run for the position of Vice President of the TULC executive board, Settles told Plaintiff to sit her ass down and be a secretary until he tells her otherwise.

114.   Settles informed Plaintiff that she would be going to the Ford Department with him after he was assigned to the office of Vice President. When Plaintiff advised Settles that she did not mind working for Vice President Cindy Estrada, Settles told her "mother fucker shut the fuck up" and to "appreciate when someone is trying to take care of [her]".

115.   Settles met with Plaintiff and Local Union President, Felecia Browning. After a disagreement, Settles threatened to demote Plaintiff by sending her back to Blue Cross. When Plaintiff became visibly upset, Settles summoned a waiter and said "bring her ass a drink to calm her down".

116.   During Plaintiff's initial interview with Settles, Settles asked Plaintiff if she planned on having more children. After Plaintiff said that she "wasn't sure",

Settles informed Plaintiff that if she did plan on having more children, "this would probably not be the job for [her]".

117.   Settles asked Plaintiff to bring two of her female friends, Alecia Greene and Chelette Smiley, to a CAP Conference in Washington DC. During their time in DC, Settle's lured Smiley into a bedroom in the Hospitality Suite with him at his hotel. When Smiley refused to meet his sexual demands, Settles screamed "Bitch, get your motherfucking ass out of here! Get the fuck out of my face!". This was witnessed by the Senior Director of BCBSM Patricia Snyder, Director of BCBSM Vera Grigorian, International Representatives; Kevin Tolbert, Daryl Nolan, Alecia Greene, Plaintiff, and many others. The following day, Settles realized his actions were extremely inappropriate, and in an effort to make amends, moved Smiley and her roommate Greene to a nicer room at the conference hotel.

118.   Settles frequently reiterated the common theme that Plaintiff served at the discretion of him and if he became unhappy, Plaintiff could and would be demoted to her last menial position with her former employer prior to becoming a union officer.

119.   During a meeting with Plaintiff, Settles and another employee, Settles informed Plaintiff and the other employee that they would both be divorced in two years, as marriages in the UAW do not last. When Plaintiff stated that she disagreed

22

because she loved her husband, Settles laughed and said he thought the same about his first wife.

120.    Settles nicknamed Plaintiff "Beyonce" and constantly addressed her as such instead of by her own name.

121.    Settles forced Plaintiff to meet Kwame Kilpatrick, former mayor of Detroit, at the TULC so Kilpatrick could "see a pretty face" to help him feel better before he went to prison. Plaintiff asked her friend, Alecia Green (BCBSM), to accompany her because she was too uncomfortable going alone.

122.    Plaintiff received a phone call and voicemail from Settles while on medical leave in May of 2019. In the voicemail, Settles swore at Plaintiff while requesting a call back.

123.    During the course of Plaintiff's employment with the UAW, Settles made numerous other sexually offensive and intimidating comments to Plaintiff.

124.    Settles' unlawful harassment of Plaintiff was witnessed and known by UAW leadership who failed to take any corrective action.

125.    The atmosphere of harassment and hostile work environment for women, particularly women of color, was pervasive.

126.    Defendants were aware of the pervasively hostile work environment and did nothing to address it.

127.   Plaintiff feared speaking up about the years of on-going harassment, as she feared retaliation.

128.   Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC") in November 2019.  (Exhibit 2 – EEOC Charge)

129.   On March 2, 2020, the EEOC issued a notice or right to sue letter to Plaintiff.   (Exhibit 3 – Right to Sue Letter)

130.   In April 2020, Plaintiff's salary was reduced by 50% creating a further significant financial hardship on Plaintiff.

131.   Plaintiff timely filed this Complaint.

## COUNT I
## SEXUAL HARASSMENT – HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.*, AS TO DEFENDANT UAW

132.   Plaintiff incorporates by reference all preceding allegations as though fully restated and set forth herein.

133.   At all material times, Plaintiff was an employee, and Defendant UAW was an employer as defined by Title VII.

134.   Plaintiff is a member of a protected class based on sex, race and ethnicity.

135.   During the course of her employment with the UAW, Plaintiff has been subjected to frequent, demeaning, offensive conduct and comments of a sexual

nature because she is a woman, including conduct and comments by individuals who had authority over Plaintiff's employment and working conditions.

136.   The above referenced conduct was unwelcome and created a sexually hostile work environment.

137.   The above described conduct was based on Plaintiff's gender and race.

138.   The above described conduct was so severe and/or pervasive that a reasonable person in Plaintiff's position would find the work environment at the UAW to be hostile and abusive.

139.   Plaintiff has been undergoing psychological treatment for years as a result of the above-described conduct, which has affected her and her marriage and Plaintiff is unequivocal in her belief that the conduct and the environment that pervades the UAW is abusive.

140.   Foster's physical abuses and threats were not offhand comments or isolated incidents.

141.   As set forth above, Defendants' tolerance of this pervasive air of harassment made Plaintiff's work environment intolerable.

142.   The UAW knew or should have known of the above described conduct but failed to take immediate and appropriate corrective action to remedy the harassment suffered by Plaintiff.

143.   The UAW's failure to take immediate and corrective action to stop the harassment constitutes intentional discrimination of Plaintiff.

144.   The UAW acted with reckless indifference to Plaintiff's rights.

145.   As a direct and proximate result of the UAW's unlawful actions, in violation of Title VII, Plaintiff has suffered injuries and damages including but not limited to economic losses, pain and suffering, embarrassment and humiliation.

146.   Plaintiff is entitled to compensatory and punitive damages, equitable relief, attorney's fees and costs.

**COUNT II**
**SEXUAL HARASSMENT AND  HOSTILE ENVIRONMENT IN**
**VIOLATION OF THE ELCRA**
**AS TO ALL DEFENDANTS**

147.   Plaintiff incorporates by reference all preceding allegations as though fully restated and set forth herein.

148.   At all material times, Plaintiff was an employee and Defendants UAW, Foster, and Hardy were employers and/or agents within the meaning of the ELCRA, MCL 37,2101, *et seq*.

149.    Plaintiff was sexually harassed by Defendants throughout the course of her employment.

150.   The sexual harassment included but was not limited to unwelcome comments and conduct of an offensive and sexual nature directed at Plaintiff based on her sex.

151.   The unwelcome sexual conduct and comments were intended to and did substantially interfere with Plaintiff's employment, creating an intimidating and hostile or offensive work environment.

152.   Defendants knew or should have known of the harassment

153.   Defendants failed to adequately investigate and failed to take prompt appropriate corrective action.

154.   Defendants' sexually harassing conduct constitutes sexual discrimination in violation of MCL 37.2101, *et seq.*

155.   As a direct and proximate result of Defendants' unlawful actions against Plaintiff, Plaintiff has suffered injuries and damages, including but not limited to loss of career opportunities, humiliation, embarrassment, mental and emotional distress; and the loss of the ordinary pleasures of everyday life.

156.   As a result of Defendants' unlawful conduct, Plaintiff has suffered damages and is entitled to compensatory damages in excess of $75,000, equitable relief, attorneys fees and costs.

## COUNT III
## RETALIATION UNDER TITLE VII AS TO UAW

157.   Plaintiff incorporates by reference all preceding allegations as though fully restated and set forth herein.

158.   Plaintiff's report of Foster's harassment to Defendants constitutes activity protected by Title VII.

159.   The UAW was aware of Foster's harassment of Plaintiff.

160.   Instead of the UAW taking immediate and corrective action against Foster, Plaintiff was reassigned to a position that reported directly to Foster and her office location was downsized.

161.   Plaintiff engaged activity protected by Title VII when she filed an EEOC charge against the UAW.

162.   The UAW was aware of the EEOC charge filed by Plaintiff.

163.   Thereafter, Plaintiff's salary was substantially reduced by 50% creating a further financial hardship for Plaintiff.

164.   The UAW reduced Plaintiff's salary by half in retaliation for Plaintiff engaging in activity protected by Title VII.

165.   Reassigning Plaintiff to a position that reports to her harasser, reducing Plaintiff's salary by 50% and eliminating nearly all of her benefits except health insurance are materially adverse actions.

166.   Had Plaintiff not opposed Defendants' unlawful actions, she would not have been subjected to these materially adverse actions.

167.   As a direct and proximate result of Defendants' unlawful actions against Plaintiff, Plaintiff has suffered injuries and damages, including but not limited to loss of career opportunities, humiliation, embarrassment, mental and emotional distress; and the loss of the ordinary pleasures of everyday life.

168.   As a result of Defendants' unlawful conduct, Plaintiff has suffered damages and is entitled to compensatory damages in excess of $75,000, equitable relief, attorneys fees and costs.

**COUNT IV**
**RETALIATION UNDER ELCRA**

169.   Plaintiff incorporates by reference all preceding allegations as though fully restated and set forth herein.

170.   Plaintiff properly reported Foster's harassment to the UAW, which was protected activity by the ELCRA.

171.   Defendants were aware of Foster's harassment of Plaintiff.

172.   Rather than implement immediate corrective activity, Defendants reassigned Plaintiff to a position that still reported directly to Foster and downsized her office location.

173.   Additionally, Defendants did not implement any corrective action against Foster for his admitted wrongful conduct.

174.   Foster was aware of Plaintiff's complaint to his supervisors.

175.   Plaintiff engaged in protected activity by filing an EEOC charge against the UAW.

176.   Defendants were aware of Plaintiff's protected activity.

177.   Thereafter, Plaintiff's salary was significantly reduced by 50%.

178.   Plaintiff's salary would not have been reduced by half had she not filed an EEOC charge.

179.   As a direct and proximate result of Defendants' unlawful actions against Plaintiff, Plaintiff has suffered injuries and damages, including but not limited to loss of career opportunities, humiliation, embarrassment, mental and emotional distress; and the loss of the ordinary pleasures of everyday life.

180.   As a result of Defendants' unlawful conduct, Plaintiff has suffered damages and is entitled to compensatory damages in excess of $75,000, equitable relief, attorneys fees and costs.

WHEREFORE, Plaintiff requests that this Court enter judgment in favor of Plaintiff and against Defendants, providing Plaintiff the following relief:

A.   Awarding money damages in excess of $75,000.00 for any past, current and future financial losses;

B.   Awarding punitive damages;

C.   Awarding equitable relief including but not limited to an injunction prohibiting any further acts of discrimination;

D.   Awarding pre-judgment and post-judgment interest;

E.   Awarding reasonable attorney fees as provided by law;

F.   Awarding costs as provided by law; and,

G.     Such further legal and/or equitable relief as the Court deems just and proper.

Respectfully submitted,

s/ Avery K. Williams
WILLIAMS ACOSTA, PLLC
Avery K. Williams (P34731)
Lisa M. Gardner (P54971)
Attorneys for Plaintiff
535 Griswold, Suite 1000
Detroit, MI 48226
(313) 963-3873
awilliams@williamsacosta.com

/s/ Gerald K. Evelyn
GERALD K. EVELYN (P29182)
Attorneys for Plaintiff
535 Griswold, Suite 1000
Detroit, MI 48226
(313) 962-3500
geraldevelyn@yahoo.com

Dated:  May 27, 2020

## **JURY DEMAND**

Plaintiff, Patricia Morris-Gibson ("Plaintiff"), hereby demands a jury trial.


Respectfully submitted,


s/ Avery K. Williams
WILLIAMS ACOSTA, PLLC
Avery K. Williams (P34731)
LISA M. GARDNER (P54971)
Attorneys for Plaintiff
535 Griswold, Suite 1000
Detroit, MI 48226
(313) 963-3873
awilliams@williamsacosta.com


/s/ Gerald K. Evelyn
GERALD K. EVELYN (P29182)
Attorneys for Plaintiff
535 Griswold, Suite 1000
Detroit, MI 48226
(313) 962-3500
geraldevelyn@yahoo.com

Dated:  May 27, 2020