Morris-Gibson v. UAW, et al.
Case No. 2:20-cv-11346

Brief in Support of Defendant George Hardy's Motion for Summary Judgment
Supporting Documents

# EXHIBIT 1

# Patricia Morris-Gibson ("PMG")
# Deposition Transcript Excerpts

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PATRICIA MORRIS-GIBSON, an      )
individual,                     )
                                )
                Plaintiff,      )
        -vs-                     )  Case No.
THE INTERNATIONAL UNION,        )  2:20-cv-11346
UNITED AUTOMOBILE, AEROSPACE    )
AND AGRICULTURAL IMPLEMENT      )
WORKERS OF AMERICA (UAW),       )
GERALD KAREEM, MIGUEL FOSTER,   )
and GEORGE HARDY,               )
                                )
                Defendants.     )


Videotaped Deposition of PATRICIA MORRIS-GIBSON

Wednesday, July 7, 2021 - 9:58 a.m. EST


Reported by:

SUSAN K. TODAY, CSR-IL, RPR

Job No.: Mo2722

Page 30

1        A.    No.

2        Q.    You don't know?

3        A.    No, I don't know.

4        Q.    So you came on staff at the UAW in

5    November of 2018 -- I'm sorry -- 2008?

6        A.    Yes.

7        Q.    And what does an International rep in

8    the TOP department service -- TOP do?  Or at least

9    what did they do at that time?

10        A.    At that time I serviced BlueCross

11    BlueShield.  So I negotiated their contracts.  I

12    was a part of their arbitrations.  I was a part of

13    their grievance meetings, their presidents

14    meetings.  Any type of meeting that they would

15    have, that the union leadership at BlueCross would

16    have, I was a part of that.

17        Q.    And at that point the TOP department was

18    underneath Vice President Settles; is that right?

19        A.    Yes.

20        Q.    And who was your supervisor?

21        A.    Dave Burtch.

22        Q.    What position did Dave Burtch have, if

23    you recall?

24        A.    He was an AA.  He was Jimmy's top AA.

Page 40

1    Vice President Settles, or you had no opinion?

2         A.    I was ecstatic that it was under the

3    office of the president.

4         Q.    Did you make a request at any point to

5    work in the Ford department under the office of

6    Vice President Settles?

7         A.    In the Ford department?

8         Q.    Yes.

9         A.    I was already working up under Vice

10   President Jimmy Settles.

11        Q.    After 2014 when you were working with

12   the office of the president, correct?

13        A.    Correct.

14        Q.    And at some point after you moved to --

15   your report moved under the office of the

16   president, did you make a request to go work for

17   the Ford department?

18        A.    No.

19        Q.    Am I correct that the 2014 reassignment

20   to TOP was sort of last -- sort of the most recent

21   position reassignment that you had at UAW?

22        A.    Are you asking when I -- I'm sorry.  Can

23   you just --

24        Q.    Yeah.  When you were reassigned sort of

Page 41

1   to the TOP department in 2014 --

2         A.    Okay.

3         Q.    -- was that the last reassignment you

4   had at UAW?

5         A.    Yes.

6         Q.    So I'm going to mark a couple of

7   documents.

8         A.    I'm sorry.  Can I just go back to that

9   question --

10        Q.    Yes.

11        A.    -- the last reassignment?

12              I was also assigned from IPS as well.

13        Q.    That's fair.  So in 2019 you -- your

14   sort of duties were -- you were given duties in the

15   IPS department rather than the TOP department?

16        A.    No.  Both.

17        Q.    Both?

18        A.    Yes.

19        Q.    So at some point in 2019 your job duties

20   included IPS work in addition to TOP work; is that

21   fair?

22        A.    Right.  And some State of Michigan.

23        Q.    Okay.  So I'm going to mark some

24   documents.  So I will start by marking this as

Page 104

1   my own calendar.

2       Q.   So what calendar did you keep?

3       A.   I usually keep one in my cell phone and

4   also kept -- I'm old school -- also just had my

5   little writings.

6       Q.   And do you still have your calendar

7   entries for 2018?

8       A.   Probably not.  I don't know.  I can

9   check.  I still have a lot of stuff from 2018.  And

10  I might have it in my old phone.

11          But if I wasn't on vacation or medical

12  and the presidents had a meeting, more than likely

13  I was there.

14      Q.   Okay.  Am I correct that you went out on

15  leave on October 3rd of 2018?

16      A.   Yes, I believe so.

17      Q.   How far in advance of your going out on

18  leave on October 3rd did the kiss incident occur

19  with Mr. Foster?

20      A.   I'm not sure because I can't remember

21  what date the kiss occurred.

22      Q.   Okay.  If there was a presidents meeting

23  on the 26th of September, when would have been the

24  previous presidents meeting?

1      A.     The president meetings -- they're

2   biweekly meetings.  They're every two weeks.

3      Q.     Okay.  Can you flip back to Page 28 of

4   this calendar?  It shows that there was a

5   presidents meeting September 5th.  Do you see that?

6      A.     Uh-huh.

7      Q.     Do you have any reason to believe there

8   wasn't a presidents meeting on September 5th?

9      A.     No.  I do know that there were also

10  other meetings on that week.  My calendar was

11  always full.  I never used this, never.

12           If someone sent me this meeting notice

13  and it would pop up, every now and again I might

14  respond and I would say I was going to attend.

15           But these should be filled.  That's why

16  I know that is not accurate because my every day

17  was filled just about with meetings.

18      Q.     I think I probably will have a

19  conversation with your counsel about asking you to

20  pull those calendars.  To the extent you have

21  things that are responsive, I think they should be

22  produced so that we can ask you questions about

23  them and try to get some dates.

24      A.     That one I most definitely will pull up.

1    A.    George had IPS.  Mark Liburdi had TOP

2    and George had IPS.  So when I say he had IPS, he

3    was the AD over IPS and Mark Liburdi was the AD

4    over TOP.  And then George became the AA when Ruben

5    left.

6    Q.    Okay.  And then after Ruben left you had

7    conversations with George Hardy about reassigning

8    you; is that fair?

9    A.    Not reassigning me but about me learning

10   another line of business.

11   Q.    Got it.  So what lines of business sort

12   of were available within the department?

13   A.    Well, we had IPS, we had arbitration, we

14   had aerospace, insurance, and state of Michigan.

15   At that time we didn't have gaming.  Gaming came

16   later.

17   Q.    In speaking to Mr. Hardy about your

18   desire to learn or work in a different line of

19   business, did you ever make a connection between

20   your desire to do that and your desire not to work

21   with Mr. Foster?

22   A.    No.  Did I ever tell George or relay

23   that to George?

24   Q.    Yes.

1       A.      No.

2       Q.      Was it part of what was motivating you

3   though?

4       A.      Once Miguel came to the department I had

5   that conversation, most definitely.  And I would

6   have never told George why.  I would have never got

7   myself in that type of trouble.

8       Q.      What kind of trouble would it have been?

9       A.      I wouldn't want to end up in a situation

10  where -- that I'm in now.  I feel like I lost my

11  job because of all of this.  That's why I keep

12  saying I just wanted to do my job.

13          I never would have said anything about

14  sexual harassment to anyone because I just wanted

15  to do my job.  And I say that because I didn't want

16  to end up like this.  I didn't want to end

17  up -- I feel like retaliation.

18          I just -- somehow I did not tell George

19  that I wanted to move, you know, because Miguel was

20  over TOP.  But I did tell George and I kept going

21  back and I kept going back, you know, when is this

22  going to happen.  George, you said you were going

23  to do this.  George, when can I move, when can I

24  leave.  I kept going back and having that

Page 135

1          A.     There were three assistant directors.

2    Miguel was one of them.

3          Q.     And who were the other two?

4          A.     Nadja was one.  I'm trying to think.

5    Nadja was an AD.  George was an AD for a minute and

6    then he became AA.  Then there was Miguel, Mark

7    Liburdi.  Okay.

8                 They didn't replace George so we ended

9    up with two in the end, which was Nadja and Miguel.

10         Q.     Okay.  So I guess one of my questions is

11   when you spoke to George about wanting to go to

12   work for a different area under his umbrella, did

13   you only specify departments that Miguel was not

14   involved with?

15         A.     Yes.  I actually also put that in

16   writing.  When Joe came, I put it in writing to

17   Joe.

18         Q.     Okay.  And Joe came at some point in

19   2019, is that correct, or after you came back from

20   leave?

21         A.     After I came back.

22         Q.     All right.  So you went out on a leave

23   we previously established October 3rd, right?

24         A.     Yes.

Page 136

1      Q.    And approximately do you recall when you

2   came back to work at UAW?

3      A.    March 11th.

4      Q.    Of 2019?

5      A.    Yes.

6      Q.    And during this period when you were out

7   on what I'll call like the first period of

8   disability leave for our purposes, you were sent

9   for an IME with Dr. Shiener; is that correct?

10     A.    That is correct.

11     MS. CARTER:  So let's mark a document.

12              (A document was marked Defendants'

13              Deposition Exhibit No. 7.)

14   BY MS. CARTER:

15     Q.    So I'm handing you a document that has

16   been marked as Exhibit 7 with Bates numbers UAW 414

17   to 423.

18              Do you recognize this document?

19     A.    Yes.

20     Q.    Is this the report that Dr. Shiener, the

21   IME, prepared?

22     A.    I believe so.

23     Q.    And the first sentence of this says that

24   he conducted an evaluation of you on February 28,

Page 139

1    things that are in Dr. Shiener's report.

2        A.    Okay.

3        Q.    Is it correct that you told Dr. Shiener

4    that you did see yourself returning to work at UAW?

5        A.    That I didn't or I did?

6        Q.    That you did.

7        A.    Yes.

8        Q.    And isn't it in fact true that you

9    wanted to return to work at this point in time?

10       A.    Yes.  After I found out that George was

11   demoted and we had a new AA, which was Joe Rioux, I

12   thought it was because of what happened with me

13   before I left, before I went on medical, so I

14   thought it would be safe to go back and I was going

15   to actually end up in another department.

16       Q.    Okay.  What was your basis for believing

17   that George's demotion and the appointment of a new

18   AA was related to you in any way?

19       A.    Because George was liked by everyone.

20   He was doing a great job.  I didn't -- my opinion,

21   I didn't see any reason for him to be demoted

22   outside of the way he handled my case.  Or maybe

23   that's what I wanted to belief.  I don't know.  But

24   I was happy to know that there was going to be

Page 140

1    someone new coming in to take over the department.

2        Q.    And when you say the way he handled your

3    case, are you referring to the report of the kiss

4    by Mr. Foster?

5        A.    The way he handled the whole ordeal with

6    bringing me into Miguel's office.  Just all of

7    that.

8              And I thought because he didn't take it

9    to human resources that that might have had

10   something to do with it.

11       Q.    What's your basis for believing he

12   should have taken it to human resources?

13       A.    After Nadja advised that that's where he

14   should have taken it.

15       Q.    Anything else?

16       A.    Because there was a complaint.  I mean,

17   we don't have anything written, like any rule where

18   there's a list of things that you should have taken

19   and not take.

20             But because Nadja, who was another

21   management person at that time, said she spoke with

22   George and told George he should have taken it to

23   human resources.  At that point I believe he should

24   have as well.

Page 162

1    discussed your -- for which you prepared this

2    document, Exhibit 8?

3         A.    George and Miguel and Joe.

4         Q.    Okay.  And you identified that you would

5    be interested in gaining aerospace and IPS; is that

6    right?

7         A.    Yes.

8         Q.    And that you wanted to attend

9    arbitrations?

10        A.    Yes.

11        Q.    Did you at any point tell Joe Rioux that

12   you didn't want to be reassigned if it meant --

13   reassigned to an area if it meant working with

14   Mr. Foster?

15        A.    I thought this did it.

16        Q.    And why would this do it?

17        A.    Because TOP is not on here and Miguel

18   only had TOP.

19        Q.    Okay.  Did you ever specifically tell

20   Joe that your issue with TOP was an issue with

21   Miguel?

22        A.    I never told anyone about my issue with

23   Miguel as it relates to TOP because I -- I just

24   wanted to come do my job.  I did not want to have

Page 163

1    any troubles.  I didn't want to get fired, in

2    organizing.  I didn't want any problems.  I just

3    wanted to work.  I felt like after all my years of

4    just servicing that's what I should be able to do,

5    just come to work and do my job.

6            So no, I did not tell Joe Rioux anything

7    because Joe Rioux would have shared it with Miguel,

8    George, Shrock, everyone.  No, I didn't.

9        Q.    Okay.  And do you have any reason to

10   know if Joe Rioux knew anything about the kiss that

11   Hardy gave you or any of your other previous

12   interactions with Hardy?

13       MR. EVELYN:  Objection as to form.

14           Go ahead; answer.

15   BY THE WITNESS:

16       A.    I didn't -- I thought he did up until my

17   meeting with Shrock when Jeff Shrock advised me he

18   didn't.

19   BY MS. CARTER:

20       Q.    So why did you think he did?

21       A.    Because they all in that -- I don't want

22   to say clique, but a lot of management is just in a

23   clique.  I figure why wouldn't he know.  It's

24   something that just happened before he became the

Page 168

1    on or about March 26th of 2019, does that sound

2    right?

3         A.    Sounds about right.

4         Q.    What was your understanding of the

5    purpose of that staff meeting?

6         A.    That we were going to get our

7    assignments.

8         Q.    And who was present at that meeting?

9         A.    I can just say who wasn't present

10   because it was the entire staff with the exception

11   of Sandra because I believe she was out on medical.

12   And Nadja I don't believe was at that meeting.  And

13   I don't -- and Laura was no longer in our

14   department.  I think everyone else was there.

15        Q.    So did he just sort of go around the

16   room and give people assignments or how did it

17   work?

18        A.    It started with Joe saying that Miguel

19   and George now have the new assignments and Miguel,

20   I'm going to let you start.  And Miguel had his

21   documents and he handed one over to me, gave one

22   over to Anthony and one over to Jorge.

23        Q.    And what was on your document?

24        A.    That I would be reporting to Miguel for

Page 169

1   HAP, which is still insurance, and then I would

2   also have some assignments with George, which is

3   IPS.

4            And at that point I just screamed out

5   why can't I get out of TOP.  I was very emotional.

6   And Joe Rioux' response was this is not the meeting

7   for that; we can talk about that later.  And after

8   that I said absolutely nothing and the meeting just

9   went on.

10           Later after the meeting was over I was

11  upset.  I was on my way home and George saw that I

12  was upset.  As I was walking down the hall he

13  called me to his office.  He's like, Patricia, he

14  said, you just got to calm down.  You know, you got

15  Joe Rioux upset.  He felt like you disrespect him

16  in the meeting, you questioned his authority.

17           And I said I don't give a damn.  I said,

18  George, you're a part of everything that happened

19  before.  I have been gone four months.  Four

20  months.  I said why don't anybody give a damn.  Why

21  don't anybody care?  He's like Patricia, just calm

22  down, I'll talk to Joe, I'll take care of it, I'll

23  take care of it.  I said I don't trust anyone and

24  walked out.

Page 170

1        Q.    So who, if anyone, did you talk to about

2    getting an assignment where you would not be

3    reporting to Miguel following that meeting?

4        A.    Following that meeting?  There wasn't

5    another meeting.  After that I requested my IME and

6    I requested -- after this happened I requested my

7    IME report and I requested a copy of my personnel

8    file because I'm like did the IME doctor not tell

9    them what I just went through?  It's like what's

10   going on with these people.  Why don't anybody

11   care?  I just felt like nobody cared.

12              And after that an investigation started,

13   my second investigation.

14       Q.    You didn't expect Dr. Shiener's report

15   to contain a narrative of everything you had told

16   Dr. Shiener, right?

17       A.    I expected his report to pertain to

18   things that happened with me regarding why I was

19   out from UAW, sexual harassment, not my medical

20   history, my past, my parents and all.  I didn't

21   expect any of that.

22       Q.    You expected Dr. Shiener's report to

23   contain your allegations of harassment at UAW; is

24   that right?

Page 176

```
 1   my old office because it was still my office.  I
 2   was going to my office to get something out of the
 3   office and he was standing like right in front of
 4   Sandra Parker's office.  And when I saw him, I just
 5   turned around and I went back the other way.
 6        Q.    Anything else in terms of instances of
 7   attempted intimidation?
 8        A.    Not that I can recall right now.
 9        Q.    All right.  So did there come a time
10   when you were interviewed by Jeff Shrock about your
11   interactions with Miguel Foster?
12        A.    The investigation?
13        Q.    Yes.
14        A.    Yes.
15        Q.    And am I correct that your interview
16   with Mr. Shrock occurred April 2nd of 2019?
17        A.    Yes.  Well, I met with Jeff four times.
18        Q.    Okay.
19        A.    The first time I met with Jeff I was
20   with a committee person named Robert Evans because
21   my committee person wasn't available.  But -- okay.
22   I called my president.  I tried to reach him and I
23   couldn't so I left him a message.
24              As we were on the way to Jeff Shrock's
```

Page 177

 1   office the president called and he said, no, you're

 2   not going to meet with Jeff Shrock and Robert

 3   Evans; I want to be in your meeting.  So go ahead

 4   to the meeting and table the meeting and let Jeff

 5   Shrock know that you can't meet with him until I

 6   come in.  So I did that.  That was my first

 7   meeting.

 8        Q.    So to stop you there.  That first

 9   meeting, there was no substantive discussion, like

10   you met him as in "Hi, I'm Jeff"; "Hi, I'm

11   Patricia," but there was no substantive discussion;

12   is that fair?

13        A.    He did say that he wanted to meet with

14   me and my union representative to talk about the

15   complaint that I had filed -- to talk about the IME

16   report that was filed.  And I said okay.  And so

17   that was the first.  And so we left after that,

18   Robert and I.

19              The second meeting was he just wanted to

20   let me know there was going to be a thorough

21   investigation.  And at that meeting I asked if I

22   could move my office.  I told him because I was no

23   longer feeling safe over on that side.  And he told

24   me it would be okay.

Page 178

1            And then the third meeting was the
2    initial investigation meeting.
3        Q.    And that's the April 2nd one?
4        A.    No.  I'm sorry.  Even in that second
5    meeting, that's the one with Joe Rioux, and that's
6    when he advised that I would be reporting to Joe
7    Rioux and -- I would be reporting to Joe Rioux,
8    that's what he said, while the investigation was
9    going on.
10       Q.    So am I correct that Jeff Shrock
11   interviewed you about your allegations concerning
12   Miguel Foster prior to the meeting with you and Joe
13   Rioux about where your office was going to be?
14       A.    No.  When you say prior, no.  That was
15   after my meeting with Joe Rioux that he did the
16   investigation on me.
17       Q.    So it's your testimony that the meeting
18   about where to move your office occurred before the
19   interview, the substantive interview?
20       A.    Only because he had already told me that
21   there was going to be an interview when I met with
22   him and Robert.  So one, that there was going to be
23   interview once Scott Andrews was available.  I
24   tabled that one because Scott told me to.

Page 179

1            The second time that we met it was with

2    Joe Rioux, Scott, me, and Jeff.  And that was to

3    tell me who I was going to be reporting to until --

4    and I'm trying to think if Scott was even

5    available.  I know me, Joe Rioux, and Jeff was

6    there, but that was just to let me know that my

7    reporting structure has changed and that's because

8    Scott wasn't there.  So -- but he asked if he can

9    meet with me, if it was okay if Scott wasn't there

10   and I told him yes.  And he said this meeting was

11   just about the reporting structure.

12            So the next meeting was the actual --

13   Scott came to the meeting and we actually met.

14       Q.   So earlier this morning we looked at a

15   document that was marked as Exhibit 3.  These are I

16   believe notes of Jeff Shrock's sort of interview

17   with you; is that fair?

18       A.   Yes.

19       Q.   Okay.  And this is dated April 2nd,

20   2019.  Does that sound about right?

21       A.   Yes.

22       Q.   So --

23       A.   He must have called me in on April 1st

24   because I met with him prior to meeting with --

Page 180

1    prior to our investigation.  And he moved my

2    desk -- he allowed me to move prior to the

3    investigation.

4        Q.    Okay.  Did the meeting that you had

5    where you discussed a revised reporting structure

6    happen before or after April 2nd of 2019?

7        A.    I don't know if it was -- it had to

8    happen before because this is the investigation.

9        Q.    Okay.

10       A.    So he moved me prior to, or he allowed

11   me to move prior to.  He asked Joe if there were

12   any other available offices.

13             Unless it happened on the same day at a

14   different time.  I'm not really sure of the date,

15   but I do know he allowed me to move my desk.

16       Q.    Okay.  It's my understanding that after

17   the investigational interview on April 2nd that

18   there was a subsequent meeting with you and Shrock

19   and Joe Rioux to discuss who you would report to in

20   terms of work.  Does that sound right?

21       A.    I don't know.  I'm not sure.  I'm just

22   not sure of the dates.  But I do know that yes,

23   there was a meeting for me to -- for them to report

24   who I would be reporting to.  I'm just not sure of

1  convention, where, you know, constitutional

2  convention.

3      Q.    A thousand-plus people; is that fair?

4      A.    Maybe so.

5            And as far as who work on the floor,

6  it's whoever they assign at the time.  So different

7  departments are assigned to work the floors.

8      Q.    Approximately how many people work on

9  that floor in Solidarity House?

10     A.    How many people work the convention?

11     Q.    No.  I'm sorry.  Work on -- what floor

12  did you work on in Solidarity House?

13     A.    Two.  Second floor.

14     Q.    How many people on the second floor

15  roughly?

16     A.    Maybe 20.

17     Q.    How many people work in Solid House as a

18  whole?

19     A.    I'm not sure.

20     Q.    How many floors are there?

21     A.    Five, six.  I don't know.  Five I think.

22  Well, if you count the basement because you do have

23  people down there, I think it's six.

24     Q.    At any point during the investigation

Page 192

1  process in April of 2019 did you ask to move to a

2  different department?

3      A.    No, but I did ask why can't Miguel be

4  moved to a different department.  When he told me I

5  could ask to move my office, I asked why couldn't

6  he move his office.  Why do I have to move my

7  office.  And my president asked that question as

8  well.

9      Q.    So the questions about Miguel moving

10  offices, that was about the physical location of

11  his office, right?

12      A.    Yes.  That was about me being three

13  doors down from him.

14      Q.    Okay.  Did you ever ask if Miguel could

15  move departments, not physical office but the

16  department to which he was assigned?

17      A.    When he asked -- when Joe Shrock asked

18  me what did I want, I said not to have to see

19  Miguel every day.  I said not to have to work with

20  Miguel.

21          So yes, I did tell him I don't want to

22  see him, basically send him someplace else.

23      Q.    Well, what you said was you didn't want

24  to have to see Miguel every day, right?

1     A.    Which is impossible being on the second

2     floor.  We share the same kitchen, we share the

3     same copy room, we share the same secretaries.

4     That's impossible.

5           I saw Miguel when I was moved over to

6     the other side just temporarily and I had to turn

7     around.  But I was told I can come in early, I can

8     leave late.  If I need copies, instead of me

9     copying them, I can give them to the secretary and

10    have her copy.  That would keep me from running

11    into Miguel.

12    Q.    Did you ask to move to a different

13    department within UAW altogether?

14    A.    No.  I didn't want to move to a

15    different department.  I wanted to continue to work

16    where I was working.

17    Q.    So following Jeff Shrock's investigation

18    you were only going to be reporting to Joe Rioux;

19    is that right?

20    A.    Yeah, but Joe advised me that I can also

21    work with George.  Because they were assigning --

22    they needed people to call around and find out if

23    they was going to use (inaudible).  So in order for

24    me to do that, I had to be assigned to George.

Page 196

1   about the investigation.  Does that sound right?

2        A.   Yes.

3        Q.   So between that point and when you went

4   out on medical leave for the second major period

5   did you have any interactions with Foster?

6        A.   No.  I saw Foster and that's when I said

7   he was looking very angry.

8        Q.   Okay.  So there was the look.  Any other

9   interactions with Foster between those two times?

10       A.   I didn't see him.  No.

11       Q.   Am I correct that you went out for this

12  sort of second long period of disability on April

13  25th, 2019?

14       A.   Probably.  I'm not sure of the dates.  I

15  think.

16       Q.   But late April sounds right?

17       A.   Yeah.

18       Q.   You had been considering going back on a

19  disability leave status prior to the April 17th

20  meeting with Shrock and Naghmana, right?

21       MR. EVELYN:  Objection as to form.  Are you

22  talking about a specific time frame?

23  BY MS. CARTER:

24       Q.   Well, between when you returned -- when

Page 292

```
 1    talk about what it is that you're seeking in terms
 2    of damages in this lawsuit.
 3         A.    Okay.
 4         MR. EVELYN:  Yeah, go ahead.
 5    BY MS. CARTER:
 6         Q.    That wasn't a question.  It was more of
 7    a statement.
 8              So as I understand it, you're seeking
 9    about $2-1/2 million in lost wages.  Does that
10    sound about right?
11         A.    I think that was the last thing that we
12    got to.
13         Q.    Okay.  And is that a number that you
14    calculated or that someone else calculated?
15         A.    I actually calculated it more and I
16    believe my attorneys did, too.
17         Q.    Now I'm talking about lost wages, right,
18    in terms of money that you would have made if
19    you -- well, let me back up.
20              You're still employed by the UAW, right?
21         A.    No.
22         Q.    You are on leave from the UAW, correct?
23         A.    As of June 30th my -- I received a
24    letter that I was terminated.
```

Page 293

1      Q.     Okay.

2          THE VIDEOGRAPHER:  Sorry to interrupt.  Can

3    you move the microphone a little be closer to the

4    witness?

5    BY THE WITNESS:

6      A.     As of June 30th I was terminated.  I was

7    actually initially terminated in April, but due to

8    a mediation we had planned, I was advised that I

9    would be -- if we didn't come up with a settlement

10   at that point, the rest of my benefits and my -- I

11   would be terminated as of June 30th.

12   BY MS. CARTER:

13     Q.     And you understand that's because you've

14   been on medical leave for over a year, correct?

15     A.     Yes.  I do understand that's their

16   rationale.

17     Q.     Okay.  And that prior to the termination

18   letter you could -- if you were released to return

19   to work by your doctor you could have come back to

20   work at the UAW, correct?

21     A.     That is correct.

22     Q.     Okay.  In calculating your damages how

23   long did you anticipate continuing to work at the

24   UAW?

Page 294

1      A.     I don't know.  I could have worked as

2   long as I wanted to.

3      Q.     How long did you -- but how long did

4   you -- at what age did you anticipate retiring from

5   the UAW?

6      A.     I didn't.  It depends on when my

7   finances was right.

8      Q.     Are you aware that under the current

9   calculation you are assuming that you would have

10  worked at the UAW until you were 77 or 78 years

11  old?

12     A.     No.

13     Q.     Okay.  Do you think you would have

14  worked until you were 77 or 78 years old?

15     A.     I doubt it.

16     Q.     Okay.  What's your best estimate as to

17  when you would have retired from the UAW?

18     A.     I'm not sure.  It depends on my health,

19  my finances, if I'm still married.  I don't know.

20     Q.     Have you ever contemplated working past,

21  say, age 65?

22     A.     Yes.

23     Q.     How about past 70?

24     A.     Never gave it much thought.

Page 333

1               C E R T I F I C A T I O N

2

3               I, SUSAN K. TODAY, a Shorthand Reporter

4   and Notary Public within and for the State of

5   Florida, do hereby certify:

6               That PATRICIA MORRIS-GIBSON the witness

7   whose examination is hereinbefore set forth, was

8   first duly sworn by me and that this transcript of

9   said testimony is a true record of the testimony

10  given by said witness.

11              I further certify that I am not related

12  to any of the parties to this action by blood or

13  marriage, and that I am in no way interested in the

14  outcome of this matter.

15

16              IN WITNESS WHEREOF, I have hereunto set

17  my hand this 14th day of July, 2021.

18

19

20              SUSAN K. Today, CSR-IL, RPR

21              Notary Public, Orange County, Florida

22              My Commission expires: 12-4-2023

23

24