UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICIA MORRIS-GIBSON, an individual

      PLAINTIFF,                Case No.: 2:20-cv-11346-MAG-APP
                                Hon. Mark A. Goldsmith

v.

THE INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA (UAW), *et al.*

      DEFENDANTS.
_____

### PLAINTIFF PATRICIA MORRIS-GIBSON'S RESPONSE TO DEFENDANT UAW'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, Patricia Morris-Gibson ("Plaintiff"), through her attorneys, Gerald K. Evelyn, relies on the facts and law set forth in her brief in support of her Response to Defendant UAW's Motion for Summary Judgment or in the Alternative, for Partial Summary Judgment.

WHEREFORE, Plaintiff respectfully requests that this Court deny Defendant UAW's Motion for Summary Judgment or, in the Alternative, for Partial Summary Judgment.

Respectfully submitted,


/s/ Gerald K. Evelyn _____
GERALD K. EVELYN (P29182)
Attorney for Plaintiff
300 River Place, Suite 3000
Detroit, MI 48207
(313) 962-3500
*geraldevelyn@yahoo.com*

Dated: September 21, 2021

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PATRICIA MORRIS-GIBSON, an individual

      PLAINTIFF,                     Case No.: 2:20-cv-11346-MAG-APP
                                          Hon. Mark A. Goldsmith

v.

THE INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA (UAW), *et al.*

      DEFENDANTS.

---

## PLAINTIFF PATRICIA MORRIS-GIBSON'S BRIEF IN SUPPORT OF RESPONSE TO DEFENANT UAW'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY <u>JUDGMENT</u>

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES ......................................................................... ii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................. iv

CONCISE STATEMENT OF ISSUES PRESENTED ............................................ v

COUNTER-STATEMENT OF FACTS ....................................................................1

STATEMENT OF ADDITIONAL FACTS ...............................................................9

STANDARD OF REVIEW ...................................................................................23

ARGUMENT ......................................................................................................24

   I.   The UAW is not entitled to summary judgment on Plaintiff's retaliation
claims under either Title VII or the ELCRA because it subjected Plaintiff to an
adverse employment action after she engaged in protected activity....................24

   II.   The UAW is liable under ELCRA for the hostile work environment it
cultivated...........................................................................................................27

      A.The UAW was Aware of the Harassment and Took No Action to Stop or
Prevent it........................................................................................................29

   III.   The UAW is not entitled to summary judgment on Plaintiff's Title VII
hostile work environment claim because it was negligent in preventing sexual
harassment .........................................................................................................32

   IV.   The UAW is not entitled to summary judgment on Plaintiff's hostile-work
environment based on relevant evidence of sexual harassment by Settles ..........35

      A. Plaintiff's claim for hostile work environment based on Settles'
harassment of Plaintiff is not time-barred................................................35

CONCLUSION ...................................................................................................40

CERTIFICATE OF COMPLIANCE......................................................................41

# INDEX OF AUTHORITIES

## Cases

*Alexander v. Local 496, Laborers' Int'l Union of North America,*
   177 F.3d 394 (6th Cir. 1999)................................................................................36

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242, 248; 106 S. Ct. 2505; 91 L. Ed. 2d 202 (1986) .................... 23,24

*Booker v. Brown & Tobacco Co.,*
   879 F.2d 1304, 1312 (6th Cir. 1989) ................................................................25

*Comiskey v. Automotive Indus. Action Group,*
   40 F.Supp.2d 877, 898 .....................................................................................25

*Crawford v. Metropolitan Government of Nashville & Davidson County,*
   I555 U.S. 271, 276 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009) ..........................24

*Davis v. Sanchez,*
   157 F.3d 460, 463 (6th Cir. 1998) ....................................................................37

*Elezovic v. Bennett,*
   274 Mich App 1, 7; 731 N.W. 2d 452 (2007)........................................ 28,29,32

*Harris v. Forklift Systems, Inc.,*
   510 U.S. 17, 21 (1993)......................................................................................36

*Hawkins v. Anheuser-Busch, Inc.,*
   517 F.3d 321, 333 (6th Cir. 2008) ....................................................................38

*Laster v. City of Kalamazoo,*
   746 F.3d 634, 645 (6th Cir. 2015)....................................................................24

*Marotta v. Ford Motor Co.,*
   119 F. Supp. 3d 676, 688 (E.D. Mich. 2015) ...................................................38

*Mutchler v. Dunlap Memorial Hospital,*
   485 F.3d 854, 857 (6th Cir. 2007) ....................................................................24

*National Railroad Passenger Corp. v. Morgan,*
   536 U.S. 101, 117 122 S. Ct. 2601, 153 E. Ed. 2d 106 (2002).........................36

*Radtke v. Everett,*
   442 Mich 368, 397, 501 N.W.2d 155 (1993)......................................................28

*Sharpe v. Cureton,*
   319 F.3d 259. 266 (6th Cir. 2003)........................................................................35

*Waldo v. Consumers Energy Co.,*
   726 F.3d 802, 814 (6th Cir. 2013) .......................................................................39

*Wasek v. Arrow Energy Services, Inc.,*
   682 F.3d 463, 468 (6th Cir. 2012) .......................................................................28

*Weigel v. Baptist Hospital,*
   302 F.3d 367, 380, 96th Cir. 2002).....................................................................37

*Yazdian v. ConMed Endoscopic Techs, Inc.,*
   793 F,3d 634, 645 (6th Cir. 2015) .......................................................................25

## **Statutes**

42 U.S.C. § 2000e ........................................................................................v, 24

Elliott Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 ........................... passim

MCL 37.2101 ....................................................................................................27

MCL 37.2103(i) .................................................................................................28

MCL 37.2202(1) ................................................................................................27

## **CONTROLLING OR MOST APPROPRIATE AUTHORITY**

*Alexander v. Local 496, Laborers' Int'l Union of North America,* 177 F.3d 394
   (6th Cir. 1999)

*Comiskey v. Automotive Indus. Action Group,* 40 F.Supp.2d 877, 898

*Williams v. General Motors Corp.,*157 F.3d 553, 563 (6th Cir. 1999)

*Elezovic v. Bennett,* 274 Mich App 1, 7; 731 N.W. 2d 452 (2007)

*Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993)

*Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321, 333 (6th Cir. 2008)

*Laster v. City of Kalamazoo,* 746 F.3d 634, 645 (6th Cir. 2015)

*Marotta v. Ford Motor Co.,*119 F. Supp. 3d 676, 688 (E.D. Mich. 2015)

*National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 117 122 S. Ct. 2601,
   153 E. Ed. 2d 106 (2002)

*Radtke v. Everett,* 442 Mich 368, 397, 501 N.W.2d 155 (1993)

*Sharpe v. Cureton,* 319 F.3d 259. 266 (6th Cir. 2003)

*Wasek v. Arrow Energy Services, Inc.,* 682 F.3d 463, 468 (6th Cir. 2012)

*Weigel v. Baptist Hospital,* 302 F.3d 367, 380, 96th Cir. 2002)

*Yazdian v. ConMed Endoscopic Techs, Inc.,*793 F,3d 634, 645 (6th Cir. 2015)

iv

## <u>CONCISE STATEMENT OF ISSUES PRESENTED</u>

1.   Whether Defendant International Union, United Automobile, Aerospace, Agricultural Implement Workers of America ("UAW") is entitled summary judgment on Plaintiff's counts for retaliation under Title Vll of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et. seq.* and the Elliott Larsen Civil Rights Act ("ELCRA"), MCL 37.2101, *et seq.* where Plaintiff was subjected to adverse employment actions for engaging in protected activity.

2.   Whether the UAW is entitled to summary judgment on Plaintiff's hostile work environment claim under ELCRA where there are genuine disputes as to material facts regarding whether it took prompt remedial action in response to allegations of sexual harassment against Plaintiff.

3.   Whether the UAW is entitled to summary judgment on Plaintiff's hostile work environment claim under Title VII where the UAW did not maintain an adequate and widely known anti-sexual harassment policy and failed to take prompt and effective remedial corrective action after incidents of sexual harassment against Plaintiff was reported.

4.   Whether the UAW is entitled partial summary judgment on Plaintiff's harassment claims where allegations against Jimmy Settles, regardless of when they occurred, are not time barred and provide relevant evidence that a hostile work environment existed at the UAW.

5.   Whether the UAW is entitled to partial summary judgment as to Plaintiff's claims against Defendant Gerald Kariem ("Kariem") where Plaintiff submitted to the EEOC detailed allegations of Kariem's sexual harassment of her and where his conduct was subjectively and objectively pervasive.

## **COUNTER-STATEMENT OF FACTS**

1.      Plaintiff Patricia Morris-Gibson ("Plaintiff") admits the facts in this statement.

2.      Defendant International Union, United Automobile, aerospace and Agricultural Implement Workers of America's ("UAW" or "Defendant") statement is misleading.  Although it is true that Plaintiff was hired by the UAW on November 16, 2008, Plaintiff was notified that she was taken off payroll effective April 25, 2021. Ex. 1 – 4-23-2021 Memo Off Payroll.  Plaintiff's healthcare benefits were terminated, and she was removed from her husband's (a UAW member) healthcare plan.  Ex. 2 - PMG Decl. ¶ 9.  Plaintiff was recently informed that she is still employed by the UAW. Ex. 2 - PMG Decl. ¶ 10.

3.      Plaintiff admits that she has neither resigned nor retired from her employment with the UAW.

4.      Plaintiff contests this statement.  Plaintiff testified that she does not believe she received the 2016 Staff Council Manual which contains the policy on the Elimination of Sexual Harassment in the Workplace.  Ex. 3 - PMG Tr. 280:13-24. Sandra Parker, a member of the staff council, did not receive a copy of the 2016 Staff Council Manual until approximately 2018. Ex. 4 - Parker Tr. 52:2-8.

5.      Plaintiff admits these facts.

6.     Plaintiff admits that the Staff Council Manual applied to her employment.

7.     Plaintiff contests this statement.  See para 4, *supra*.

8.     Plaintiff contests this statement.   Shrock testified that he is aware of the procedure for reporting sexual harassment based on his experience, but that the procedures are not written down anywhere. Ex. 5 - Shrock Tr. 34:2-18.   Parker testified that the grievance and arbitration procedure is inadequate and perfunctory because there are no steps or process to follow. Ex. 4 - Parker Tr. 49:23-24 – 50:1-12.

9.     Plaintiff contests this statement.  The UAW's Elimination of Sexual Harassment in the Workplace policy does not provide a procedure for formal or informal complaints. Dkt. 52-3 PageID.750-754.   According to Shrock, the procedures for reporting sexual harassment are not written down anywhere.  Ex. 5 - Shrock Tr. 34:2-18.

10.    Plaintiff contests this statement because there was no written policy obligating supervisors and managers to report sexual harassment and Defendant has not cited to any such written provision.  Dkt. 52-3 PageID.750-754.

11.    Plaintiff contests this statement.   Plaintiff testified that she does not know if she had the 2016 Staff Council Manual. She did not receive updated copies "because they were still working on them". Ex. 3 - PMG Tr. 280:16-24.

2

12.     Plaintiff admits that the Staff Manual provides for grievance procedure and arbitration process. Plaintiff did not file a grievance. Plaintiff's staff council president told her she could not file a grievance or take it to arbitration. Ex. 3 - PMG Tr, 282:15-24 – 283:1-5.

13.      Plaintiff contests this statement.  Plaintiff's staff council president told her she could not file a grievance or take it to arbitration. Ex. 3 - PMG Tr, 282:15-24 – 283:1-5.

14.     Plaintiff contests this statement.   Plaintiff reported directly to Foster from March to October 2018, and when she returned from medical leave in March 2019.  Ex. 3 - PMG Tr, 282:15-24 – 283:1-5.

15.     Plaintiff contests this statement.     Foster was Plaintiff's direct supervisor, and was in charge of and had control over Plaintiff's assignments, her schedule, meetings, and everything related to her day-to-day tasks which had a substantial impact on Plaintiff's work conditions.  Ex. 3 -  PMG Decl. ¶ 6.

16.     Plaintiff contests this statement.     Before Plaintiff's meeting with Shrock in April 2019, Plaintiff was summoned into a meeting with Hardy, Foster and Bragg in October 2018, where she told Hardy that Foster kissed her after a meeting at BCBS then left the meeting crying. Ex. 3 - PMG Tr. 116:2-15.

17.     Plaintiff admits this statement.

18.     Plaintiff admits this statement.

3

19.     Plaintiff contests this statement.  Plaintiff admits that she did not want Hardy to take any action in response to Bragg's report because she "just wanted to do her job".  *Id.*, 112:23-24 – 113:1-21.  Plaintiff kept saying that she just wanted to do her job because she did not "want to end up in a situation where –that I'm in now. I feel like I lost my job because of all of this.  That's why I keep saying I just wanted to do my job. I never would have said anything about sexual harassment to anyone because I just wanted to do my job. And I say that because I didn't want to end up like this. I didn't want to end up – I feel like retaliation".  *Id.*, 128:17-24 – 129:1-17.

20.     Plaintiff admits this statement.  At the meeting that Hardy summoned Plaintiff into in Foster's office regarding Bragg's report of Foster kissing Plaintiff, Plaintiff repeatedly asked Hardy if she could leave the meeting. *Id.*, 115:12-24 – 116:1-22.  Hardy denied her request to leave until she admitted that Foster kissed her and denied being offended.  *Id.*, 116:7-22.  Plaintiff started crying and left the meeting. *Id.*, 116:16-22.

21.     Plaintiff can neither admit nor deny Defendant's statement because she has no knowledge of what Hardy believed. However, Plaintiff left the meeting crying.  *Id.*, 116:16-22.

22.     Plaintiff can neither admit nor deny Defendant's statement because she has no knowledge of whether any other employee informed Hardy of Foster's harassing conduct.

23.     Plaintiff contests this statement.  Plaintiff admits that she left the office after the meeting with Hardy, Foster and Bragg in Foster's office and the next day began a medical leave. Ex. 3 - PMG Tr. 117:12-14; Ex. 4 - Parker Tr. 67:22-24 – 69.

24.     Plaintiff can neither admit nor deny Defendant's statement because she has no knowledge of who recommended that she undergo an IME.

25.     Plaintiff has no knowledge of what the UAW's normal practices are regarding medical leaves.

26.     Plaintiff admits this statement.

27.     Plaintiff admits that the statement is consistent with Siddiqi's declaration but has no knowledge of whether the statement is accurate.

28.     Plaintiff admits that in 2019, she continued working in the TOP department and was given duties in the IPS department despite her request for reassignment to the departments listed in her March 19, 2021 list.

29.     Plaintiff has no knowledge of whether or not this statement is accurate. Bragg reported Foster's harassment of Plaintiff to the head of TOP, Hardy.  Dkt. 52-11 – Bragg Decl. ¶ 7. According to Parker, Bragg also told Mike Stone, the chief of staff to the UAW President, about Foster's conduct. Ex. 4 - Parker Tr. 64:10-25 – 65:1-8.

30.     Plaintiff does not dispute that Siddiqi sent an email to Shrock.

31.     Plaintiff can neither admit nor deny this statement because she has no knowledge of how or why Shrock was assigned to investigate her harassment allegations.

32.     Plaintiff admits that she requested to move her office temporarily because she no longer felt safe.  Ex. 3 - PMG Tr. 177:8-24.  Plaintiff worked with her door locked, lights off and blinds closed and taped because she was afraid that Foster would hurt her. *Id*., 174:17 – 24 – 175:1-4.

33.     Plaintiff admits this statement.

34.     Plaintiff contests this statement.  Plaintiff told Shrock that she had not been harassed by other UAW employees because she did not want it to interfere with her ability to work.  See ¶ 19, *supra*; Ex. 3 – PMG Tr. 59:23-24-60:1-21.

35.     Plaintiff admits this statement. See ¶ 32, *supra*.

36.     Defendant's statement is consistent with Shrock's declaration, but Plaintiff has no knowledge of the accuracy of the statement.

37.     Plaintiff can only admit that Foster received a four-day layoff.  Plaintiff has no knowledge of whether or not the remainder of Defendant's statement is accurate.

38.     Plaintiff contests this statement.  Although Plaintiff was informed that she would be reporting to Hardy, it was contemplated that Plaintiff would still be in an environment where she was expected to see Foster.  Ex. 5 - Shrock Tr. 117:19-

23.   Plaintiff was told that she had no choice but to see Foster in meetings, conferences, and conventions and was expected to be professional when she saw him. *Id.,* Shrock 118:15-18.

39.   Plaintiff disputes that Defendant took remedial measures. Plaintiff was still expected to see Foster at work. Ex. 5 - Shrock Tr. 117:19-23.  Plaintiff and Foster were still working on the same floor, sharing the same kitchen, copy room and secretaries. Ex. 3 - PMG:193:1-4.  Foster did not sexually harass Plaintiff after April 17, 2021, but when she saw Foster, he looked at Plaintiff with anger. *Id*.,  PMG 196:3-7.  Plaintiff feared for her life and safety. *Id.,* PMG 197:12-24.

40.   Plaintiff admits this statement.

41.   Plaintiff contests this statement.  Plaintiff also filed a rebuttal statement supplementing her charge, detailing other incidents of sexual harassment by Foster, Gerald Kariem and Jimmy Settles with the EEOC. Ex. 6 - EEOC Submission.

42.   Plaintiff contests this statement.  See ¶ 41, *supra*.  Plaintiff did not send a copy to the UAW and was not instructed to do so. Plaintiff has no knowledge of whether or not the EEOC provided a copy of her submission to the UAW.  Ex. 3 - PMG Tr. 287:22-24 – 288:1-24.

43.   Plaintiff only admits that the allegations listed were alleged in her complaint reflecting the numerous incidents of harassment during her employment at the UAW.

7

44.     Plaintiff contests this statement.  At the end of the voicemail, Settles can be heard saying that she has a pretty friend, but she gained some weight leading Plaintiff to believe Settles may have called her to have Plaintiff and one of her friends come out because he was with someone.  *Id.*, PMG 276:1-24 – 277:1-9.

45.     Plaintiff admits that Settles was not employed at the UAW in 2019.

46.     Plaintiff admits that she did not report Settles' harassment of her to a UAW supervisor or managerial employee because she wanted to keep her job and Settles made it clear that she was on a leave of absence from BCBS and he could send her back there. *Id.*, Tr. 242 -244:1-22.

47.     Plaintiff admits that she did not report Kariem's harassing conduct to a UAW supervisory or managerial employee because Kariem was director and vice president and in a position of power and Plaintiff was afraid of retaliation.  *Id.*, 221:24 – 223:1 and 319:8-12.

48.     Plaintiff admits this statement.

49.     Plaintiff admits this statement.

50.     Plaintiff admits this statement.

51.     Plaintiff admits this statement.

52.     Plaintiff can only admit that her salary and benefits were reduced and ultimately terminated.

## STATEMENT OF ADDITIONAL FACTS

1.      In approximately 2006, when Settles was the Vice President of the TOP Department, and Plaintiff was president of Local 1781, Settles saw Plaintiff at Macy's Bar at Black Lake and ran his hand across her bare stomach and said to Plaintiff "can I have some?".  Ex. 3 – PMG Tr. 232:8-24 -2341-13.

2.      In approximately 2008, shortly after Plaintiff was hired on staff, Settles called Plaintiff and told her that he was with Rory Gamble[1], who at the time was Director of Region 1A, and he needed Plaintiff to bring Gamble a bottle of water. *Id*., 235:3-24 – 236:1-5.  Plaintiff delivered the bottle of water and Settles said to Gamble. "see, I told you, I told you. Look at those nipples. I told you. She must be happy to see you". *Id*., 236:6-9.  Gamble saw that Plaintiff was embarrassed and told Settles to "leave that girl alone".  *Id*., 236:20-21.  Settles later called Plaintiff into his office and told her she must have done something to make Gamble happy because she "had him stuttering the rest of the meeting". *Id*., 237:6-18.

3.      On another occasion between 2008 and 2010, when Settles was president of TOP, Plaintiff and another co-worker, Angela Blue, were in Settle's office when Settles told Plaintiff he would buy her a pair of red bottom shoes "as long as you have them sticking out of my desk, one of desk drawers". *Id*., 238:13-

---

[1] Rory Gamble would later become UAW President.

9

24 – 240.  Plaintiff understood him to mean he wanted her in his desk drawer with her legs sticking up and out of his desk drawer. *Id.*, 240:18-22.

4.      In approximately 2010, shortly after Settles became Vice President of the Ford Department, Settles hosted a Christmas party that Plaintiff and basically the entire staff attended.  *Id.*, 249:23-24 – 1-7.  Settles called Plaintiff ordering her to "get down here", then he got up and grabbed Plaintiff by her ponytail and started rolling Plaintiff, who was seated in a chair, by her ponytail.  *Id.*, 250:2-12.  Plaintiff got up from the chair and Settles grabbed the back of her turtleneck to try to pull her back and ripped her turtleneck. *Id.*, 250:2-18.  One of the Administrative Assistants ("AA"), who was in a managerial position, witnessed this incident and almost immediately came over and apologized for Settles' behavior.  *Id.*, 251:5-24 –252:1-5.  Plaintiff did not file a grievance or report the incident because other people witnessed it, Settles was the Vice President of the Ford department and Plaintiff needed to keep her job.  *Id.*, 252:6-17.

5.      Plaintiff did not report Settles' comments to anyone at the UAW because she wanted to keep her job.  *Id.*, 242:1-11.  Settles made it clear to Plaintiff that she was on a leave of absence from BCBS and that he could send her "ass back".  *Id.*, 242:2-14, 243:8-13.

6.      While at a Coalition of Black Trade Unionists ("CBTU") conference sometime in 2010 or 2011, Foster, who was the director of the Civil Rights,

10

approached Plaintiff and "started talking in my ear asking me to go to his room". *Id.*,

50:6-17.  Plaintiff declined Foster's proposition. *Id.*, 50:6-17, 51:15-17.   Plaintiff

told her friend, Felicia Browning, who was vice president of Local 1781, BCBS,

about Foster asking her to come to his room and she called Blue, who reported to

Foster, and told her "Your boss is drunk and you need to tell your boss that he needs

to go to his room". *Id.*, 51:18-24 52:22-24, 53:1-15.

7.     Blue responded that her boss, Foster, was crazy about Plaintiff. Ex. 3 -

*Id.*, 55:2-24 – 56.  Blue testified that she mentioned to Plaintiff that she thought

Foster liked her.  Ex. 7 - Blue Tr. 23:2-7, PMG Tr. 9-13.  Foster would not say

anything, but he would raise his eyebrows when Plaintiff was around or have "have

a stupid grin on his face" when Plaintiff walked by.  *Id.*, 23:2-17, 70:17-24 – 71:1-

21.

8.     In 2014, the insurance department in which Plaintiff worked was

transferred back under the TOP department. Ex. 3 - PMG Tr. 36:7-24 – 37:1-8. The

TOP was under the President's Office.  *Id.*, 38:3-8.

9.     Beginning March 2018, Foster was appointed Assistant Director of

TOP Department.  Ex. 2 - PMG Decl. ¶ 5.  Foster was Plaintiff's supervisor and she

reported directly to Foster. *Id.*  Foster was in charge of and had control over all of

Plaintiff's assignments, her schedule, meetings, reports and all aspects of her daily

work. *Id*., ¶ 6.  Foster does not remember receiving any training in the area of sexual harassment while at the UAW. Foster Tr. 39:17-23.

10.    On March 5, 2018, Plaintiff texted Blue that Foster was her new boss. Ex. 9: 3-5-2018 Text Msg. PGMG 0062.  Blue texted: "you know Miguel like you". *Id*.  Plaintiff responded that Hopefully he's not a pest, especially since I lost the weight.  the men are acting crazy again and I don't feel like being bothered.  *Id*.

11.    In July 2018 through September 17, 2018, Foster was on a medical leave for mental stress related to the criminal investigation involving the Chrysler Training Center where Foster had formerly been assigned.  Ex. 8Foster Tr. 44:2-25 – 46:4-11.

12.    When Foster returned from medical leave in September 2018, Foster, Plaintiff and Anthony McNeil were entering Plaintiff's office for a meeting when Plaintiff stopped Foster from closing the door.  Ex. 3 -  PMG Tr. 69:9-24 – 70:1-15 and Ex. 10 – 4-5-19 McNeil Interview Notes UAW_308-309.  Foster commented "Yeah, because you don't want anyone to think I have you bent over the desk" and made a spanking gesture like he was spanking Plaintiff's rear end".  *Id*., 3:15. McNeil was uncomfortable with Foster's comment but did not say anything to Foster due to fear because Foster was his boss. Ex. 10 - 4-5-19 McNeil Interview Notes UAW_308-309.  McNeil told Foster in the past to be careful about the way people take his comments or actions. *Id*., UAW_309.

12

13.     Plaintiff, Laura Dickerson, McNeil and Foster would occasionally have lunch in the conference room or to talk about their cases and workday. Ex. 3 - PMG Tr. 62: 9-23 and 63:4-11.  On one occasion, McNeil asked Foster if he planned to have more children and Foster looked at Plaintiff and said "Patricia, are you going to have my baby?".  *Id.*, 63:18-24 – 64:1-5.

14.     McNeil knew that Plaintiff was uncomfortable with Foster's comments because Plaintiff told McNeil that she had been offended by Foster's actions and comments.  Ex. 3 - PMG Tr. 64:6-22 and Ex. 10– 4-5-19 McNeil Interview Notes UAW_308-309.  Plaintiff did not report this comment to UAW supervisory or managerial employees because she was afraid to report Foster due to his job title and for fear of retaliation.  Ex. 3 - PMG Tr. 64:23-24 – 65:1-3, 319:8-12.

15.     On a different occasion, Foster commented he liked a "woman like Patricia", pretty face and nice body. *Id.*, 67:5-24 – 25:1-4.

16.      In September 2018, while exiting an elevator after a meeting at BCBS in the Renaissance Center, in the presence of Amy Castanon, a BCBS employee and president of a local union, Foster wrapped his hand around Plaintiff's waist and kissed her on the side of her mouth. *Id.*, 91:4-2-24 – 93:9.  Castanon commented "what the F was that about".  *Id.*, 91:15-24.  Plaintiff did not know how to respond but commented "he kisses on everybody".  *Id.*, 91:15-24.  Castanon responded "no the hell he don't.  He didn't kiss me".  *Id.*, 91:15-24. Plaintiff went to her car and

13

started crying. *Id.*, 97:18-24.  Although Plaintiff did not indicate that she was upset, Plaintiff was uncomfortable and upset with Foster's comments and conduct. *Id.*, 64:6-22, 99:3-6, and Ex. 4 - Parker Tr. 33:3-24.

17.    George Hardy was the Administrative Assistant and the Department Director of the TOP department. PMG Tr. 109:2-19 and Dkt. 52-9, PageID.908 - Hardy Decl. ¶ 4.  Plaintiff reported to Foster and Foster reported to Hardy. PMG Tr. 109:17-19 and Dkt. 52-9, PageID.908 - Hardy Decl. ¶ 5.

18.    After learning that Bragg reported Foster kissing her on the elevator, Plaintiff immediately went to Hardy's office and told him that she did not need anyone to speak up for her, she is a big girl and if she had something to say to something to him, she would.  PMG Tr. 111:19-24 – 112:1-17.  Plaintiff did not want Hardy to take an action because she just wanted to do her job. *Id.,*  112:23-24 – 113:1-2.  Hardy did not ask about the incident at the Renaissance Center or if it happened, he said as far as he was concerned, it's not an issue. *Id.,* 112:6-9 and 113:3-10.

19.    The day after Plaintiff spoke to Hardy about Bragg reporting that Foster kissed her, Hardy summoned Plaintiff from her union representative, Parker's office into a meeting in Foster's office with Foster and Bragg. *Id.*, 114:14-24 –115:1-20. Plaintiff asked Hardy why she was there. *Id.*, 114:21-24.  Hardy responded that "we're a family and when things are not right in a family, families stick together".

14

*Id.*, 116:2-6.  Plaintiff asked if she could leave the meeting and Hardy responded no, he could see that she was upset, but when it is all over. they are still a family. *Id.*, 116:7-10. Plaintiff told him that yes, Foster kissed her and Hardy looked shocked. *Id.*, 116: 11-15.  Plaintiff asked again if she could leave the meeting and Hardy said no that they need to talk about it. *Id.*, 116:16-18.  Hardy said he wanted to know if Plaintiff was offended.  Plaintiff again asked if she could leave the meeting. *Id.*, 116:17-22.  Plaintiff then said no, she was not offended and asked: "Can I go now?" *Id.*, 116:17-22. Plaintiff started crying and left the meeting. *Id.*,  116:17-22.

20.    Plaintiff went to Nadja Roivas' office after meeting in Foster's office. *Id.*, 19:7-25 – 19:1-8.  Plaintiff was emotional and told Rovias that she was called into a meeting that her union representative was not invited to attend. *Id.*, 19: 9-25. There were three men in the meeting including her harasser. *Id.*, 19:20-25.  Plaintiff felt humiliated and could not believe it was happening.  *Id.*,   Plaintiff told Roivas that Foster kissed her on an elevator, Bragg told Hardy about the kiss. *Id.*, 20:1-7. Plaintiff was invited into a meeting and could not believe that the harasser was in the meeting. *Id.*, Plaintiff cried and said she felt humiliated and disrespected.  *Id.*, 20:8-11.  Plaintiff also told Roivas that it was not the first time this has happened. Ex. 11 - Roivas Tr. 20:8-11.  Plaintiff was so upset that Roivas was concerned about her ability to drive a car. *Id.*, 8-13.

15

21.     Roivas thought it was her duty to report the incident. *Id*., 21:16-25 – 22:1. Hardy stopped by Roivas' office minutes after Plaintiff left and asked how everything was going. *Id*., 45:19-23.  Roivas responded that things were not good and informed Hardy that Plaintiff was very upset about the meeting and felt humiliated.  *Id*., 43:24-25 - 44:1-5.  Roivas told Hardy he needed to report the Plaintiff's allegations to HR. *Id*., 44:9-15.  Hardy responded "I don't care what she says, I don't care how she feels, I want to keep this on this floor; I have to protect this man" referring to Foster. *Id*., 44:18-25 – 45:1-14.  Roivas made notes after her conversation with Hardy. *Id*., 23:1-23.  In her notes, Roivas wrote "Why is this so bad for women". *Id*., 23 – 24:1-23.

22.     Roivas testified that there is "a lot of sexism" at the UAW and that she has experienced sexism as an employee. *Id*., 24:25- 25:1-13.  Roivas attempted to report the sexism she experienced but was concerned about retaliation. *Id*.,  25:14-20.  Roivas thought the leadership, those with power, would retaliate against her. *Id*., 50:3-9.

23.     Plaintiff went out on a medical leave the day after the meeting in Foster's office. PMG Tr. 117:12-14 and 119:2-12.

24.     On her second day of returning to work from medical leave, as instructed by Joe Rioux, Plaintiff reported to Cobo Hall, where a convention was being held. PMG Tr. 159:21-24 – 160:1-16.  Foster told Plaintiff that Rioux wanted

to meet with them and sent Foster to retriever her. *Id*., 160:1-4. Rioux testified that he sent Foster to retrieve Plaintiff to meet with him. Rioux Tr. 46:14-15. Foster walked Plaintiff around the back of a dark area, across a stage and then to the Sergeant of Arms room where Rioux was sitting. PMG Tr. 160:4-8. Rioux told Plaintiff that he wanted to speak with her about her assignments. *Id*., 160:7-8.

25.     Rioux informed Plaintiff that she was no longer assigned to BCBS and that she would work with Foster for now and he would have a conversation with her about what she would like to do when they were back at the office. PMG Tr. 160:9-16.

26.     On or a few days after March 19, 2019, Plaintiff met with Rioux, Hardy and Foster. *Id*., 161:3-24 – 162:1-3. Plaintiff prepared a list of her preferred departments and assignments. *Id*., 160:17-24 – 161:1-13 and Ex. 8 to PMG Tr. (PGMG 0176 – 3-19-2019 Document).

27.     Plaintiff did not tell Rioux about her issues with Foster because she did not want any trouble, she did not want to be fired and transferred to organizing. PMG Tr. 162:22-24 – 163:1-8.

28.     From June 2018 to October 2020, Shrock was a top Administrative Assistant to the then UAW President, Rory Gamble. Ex. 5 - Shrock Tr. 16:10-16. Shrock had sexual harassment training in approximately 2010, during his new hire orientation. *Id*., 20:8-13. He received no additional such training. *Id*., 22:5-7.

17

29.     Shrock conducted one other investigation of sexual harassment against former employee, Rich Rankin. *Id.*, 24:17-24.   Two women made accusations against Rankin that Rankin had made direct comments to them that were inappropriate in nature. *Id.*, 26-23. Shrock did not complete the investigation because, on Shrock's recommendation, the investigation was conducted and completed by an outside firm. *Id.*, 27:2-25.   The two employees who requested the investigation be conducted by an outside firm because "they didn't trust the UAW or feel that the UAW internally would do a full investigation". *Id.*, 28 – 29:1-6.

30.     Shrock is not aware of any other written policy or directives other than the Policy.  *Id.*, 33:13-20.

31.     Shrock testified that sexual harassment can be reported to a department head, administrator, or to the Human Resources Department ("HR") or Director. Shrock Tr. 34:2-6.  Employees can also report harassment to the Civil and Human Rights Department or to the UAW President's office directly. *Id.*, 34:7-10.  Shrock is aware of the reporting mechanisms based on his experience; the procedure for reporting sexual harassment is not written down in a policy that has been distributed to employees.  *Id.*, 34:11-18.  If sexual harassment is reported to a department head, the department head should make HR aware of it. *Id.*, 34:24-25 –35 2-3. Shrock does not know when an independent body or outside agency should investigate allegations of harassment, but he does not think it is appropriate for a department to

18

investigate allegations that are alleged to have occurred within that department.  *Id*., 35:19-25 – 36:1-6.

32.    Parker, Plaintiff's union representative, described the UAW's grievance and arbitration procedure inadequate and perfunctory because there are no steps or process. Parker Tr. 49:24-25 – 50:1-5.

33.    Shrock testified that the following constitutes examples of sexual harassment, including an unwanted kiss, comments about body parts, sexual comments about being bent over a desk, unwanted touching, and grabbing someone and tearing their clothing.  Shrock Tr. 36:25 – 37:1-20.

34.    Mike Stone, then Chief of Staff to the President, directed Shrock to conduct an investigation. *Id*., 55:2-5.  There was never a discussion regarding have the investigation conducted externally. *Id*., 55: 8-13.

35.    Shrock prepared questions based on Plaintiff's accusations in her IME. *Id*., 36:1-4. Shrock interviewed Plaintiff in his office in early April 2014. *Id*., 65:7-15 and 66:1-2. Scott Andrews, Staff Council President was present for the interview. *Id*., 65:19-25.  Shrock thought someone from HR should have been present, but he did not have an HR person attend the interview of Plaintiff.  *Id*., 66:22-25 – 67:1-6.

36.    Shrock testified that President Gary Jones and Mike Stone did not think the allegations of sexual harassment were in Foster's character and that this was an exception. *Id*., 58:10-25 – 59:1-12.

37.     During her interview with Shrock, Plaintiff informed Shrock of the incident in 2008 when she first met Foster and Foster asked Tolbert who was the girl with the big titties. *Id.*, 68:5-16.  Shrock did not interview Kevin Tolbert even though he knew Tolbert was still in employed with the UAW and worked in the IPS Department.  *Id.*, 110:1-3.    Shrock acknowledged that, if true, and Tolbert corroborated the 2008 incident, it would indicate that Foster had engaged in sexually harassing behavior as far back as 2008, and that the allegations regarding the kiss was not an outlier in Foster's career. *Id.*, 68:1-25 – 71:1-9.

38.     Plaintiff described Foster's kiss on her mouth when exiting the elevator at BCBS. *Id.*, 72:10-25 -74:1-6.  Plaintiff told Shrock that she was embarrassed by the kiss and that she cried immediately afterwards. *Id.*, 74:4-20.  Plaintiff told Shrock that she reached out to her friend, Felecia Browning, a local union representative. *Id.*, 74:25 – 75:1-5.  Shrock did not interview Browning. *Id.*, 75:6-7.

39.     Shrock did not attempt to contact Tolbert, did ask for contact information for Browning and did not reach out to Castanon, the only eyewitness to Foster's kiss on Plaintiff's mouth. *Id.*, 101:1-4 and 110:1-11. Shrock acknowledged that these were people he could have interviewed but did not. *Id.*, 110:12-19.  In any event, Shrock told Plaintiff that he felt that he had conducted a full investigation. *Id.*, 110:17-23.

40.     Plaintiff told Shrock that the men in the UAW flirted with the women and you just have to learn to deal with it.  Ex. 5 - Shrock Tr. 77:19-25 – 78:1-4 PMG Tr. 58-20-24 - 59:1-3.  Shrock did not recall asking Plaintiff for any examples of men flirting with women. Ex. 5 - Shrock Tr. 78:1-6.

41.     Plaintiff did not report to Shrock that she had been harassed by other employees of the UAW because she wanted to be able to work without any interference.  Ex. 3 - PMG Tr. 59:23-24 – 60: 1-21.  Plaintiff thought that if she reported the harassment, she "would probably end up organizing somewhere".  *Id*., 60:7-21.  Plaintiff's biggest fear was that she would "be shipped out or I would be sent back to BlueCross".  *Id*., 60:12-21.   Plaintiff told Shrock that she feared retaliation or career-ending consequences if she reported behavior that she deems uncomfortable if the person is someone of power in administration.  Ex. 5 - Shrock Tr. 72:13-19.

42.     Shrock did not think that he should recommend that someone external to the UAW conduct the investigation. *Id*., 72:20-25 – 73:1-9. Shrock previously recommended that an investigation be redirected to an outside entity because the individual being interviewed thought that should happen. *Id*., 73:2-9.

43.     Plaintiff did not report Foster or Kariem's conduct because she was concerned about retaliation. Ex. 3 - PMG 319:8-12. Plaintiff testified that when you go against the leadership at the UAW, nothing good will come out of it. *Id*., 198:10-

21

24 – 199:1-4.  Plaintiff knew of people who had had things happen to them because a boss was mad, changing of the guard, or they no longer wanted that person. *Id*., 198:13-21.  Plaintiff knew of people who were sent to organizing where you are away from your family for months or years at a time. *Id*., 198:22-24 – 199:1-4.

44.     On October 26, 2017, Rovias, currently on medical leave from the UAW, was formerly and AD in the Arbitration Department.  Roivas Tr. 10:15-24. Ex. 11 - Rovias was threatened by Mike Stone, with an assignment to organizing, travelling all over the country where she could not see her family if she did not take a demotion.  *Id*., 25:21-25 – 26:1-12.   An assignment to organizing is like a punishment.  *Id*., Tr. 27:17-25 – 28:1. Hardy told Roivas that Stone wanted to demote her back to the International Representative position, but he told Stone "don't do that, you can't do that to her".  *Id*., 52:5-11 and 53: 5-18.

45.     During Shrock's investigation in April 2019, Plaintiff was told that she could move her office. Ex. 3 - PMG 191:24 – 192:1-193:1-16.  Plaintiff asked why she had to move her office and why couldn't Foster, whose office was located three doors down from her office be moved. *Id*., 192:3-8.  Plaintiff and Foster worked on the same floor, shared the same kitchen, copy room and secretaries. *Id*., 192:23-24 – 193:1-4.  When Shrock asked Plaintiff what she wanted, Plaintiff told him that she did not want to see Foster every day and did not want to work with him and to "basically send him someplace else". *Id*., 192:14-22.

22

46.    A disciplinary meeting was held in April 2019 and was attended by Foster, Rioux, Shrock and Stone. Ex. 12 - 4-16-2019 Investigative Note to File. Shrock began by "stating Foster was a valued employee" but that it was their responsibility to investigate promptly. *Id.* There was discussion about permanently moving Plaintiff's office but no discussion about moving Foster's office. Ex. 5 - Shrock Tr. 106:17-20.

47.    Plaintiff feared Foster and was afraid that he was going to hurt her. Ex. 3 - PMG Tr. 174:21-24 – 175:1-14. Plaintiff worked with her door locked, lights off and blinds closed and taped. *Id.*, 174:21-24 – 175:1-14. Plaintiff told Shrock that Foster looked like he wanted to hurt her, and she was concerned for her personal safety. Ex. 3 - PMG Tr. 175:8-14 and Ex. 5 - Shrock Tr. 9-17. Plaintiff told Shrock that she parked in an area at work that was close to the entrance where security was present which was a change from before the investigation. Ex. 5 - Shrock Tr. 76:20-25.

## **STANDARD OF REVIEW**

Motions for summary judgment are appropriate only "where there is no genuine dispute as to any material fact". Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit". *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248; 106 S. Ct. 2505; 91 L. Ed. 2d 202 (1986). There is a genuine dispute where "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party". *Anderson,* 477 U.S. at 248.  All reasonable inferences must be drawn in favor of the non-moving party. *Mutchler v. Dunlap Memorial Hospital,* 485 F.3d 854, 857 (6th Cir. 2007).

## ARGUMENT

**I.    The UAW is not entitled to summary judgment on Plaintiff's retaliation claims under either Title VII or the ELCRA because it subjected Plaintiff to an adverse employment action after she engaged in protected activity.**

Title VII prohibits an employer from retaliating against an employee because he or she has either (1) "opposed any practice made an unlawful employment practice by this subchapter", or (2) "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter". 42 U.S.C. § 2000e-3(a).

The statute does not define the term "oppose", but the Supreme Court has held that the term "carries its ordinary meaning: 'to resist or antagonize . . .; to contend against; to confront; resist; withstand.'" *Crawford v. Metropolitan Government of Nashville & Davidson County, I*555 U.S. 271, 276 129 S. Ct. 846, 172 L. Ed. 2d 650 (2009), citing Webster's new Int'l Dictionary 1710 (2d ed. 1958).  The Sixth Circuit has recognized that "[t]he opposition clause protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices". *Laster v. City of Kalamazoo,* 746 F.3d 634, 645 (6th Cir. 2015).  Further, "Title VII does not restrict

24

the manner or means by which an employee may oppose an unlawful employment practice". *Yazdian v. ConMed Endoscopic Techs, Inc.,* 793 F,3d 634, 645 (6th Cir. 2015).

The ELCRA retaliation analysis is identical to that of Title VII. As observed by the court in *Comiskey v. Automotive Indus. Action Group,* 40 F.Supp.2d 877, 898, "[T]o engage in a protected opposition activity under Title VII or Elliott-Larsen, a plaintiff must make an overt stand against suspected illegal discriminatory action". *Id., citing Booker v. Brown & Tobacco Co.,* 879 F.2d 1304, 1312 (6th Cir. 1989). Further, "to engage in a 'protected activity', a plaintiff must actually oppose activity that, if true, would be a violation of civil rights laws". *Cominskey,* 40 F. Supp. 2d at 898.

Here, Plaintiff informed Shrock of not only the sexual harassment to which she was subjected by Foster, but the harassment she endured from Settles and Kariem. Although Plaintiff's salary was reduced and ultimately terminated solely because she could not work due to the harassment she endured and the UAW's failure to actually take immediate and corrective action resulting in her suffering major depression and PTSD, Plaintiff is aware that her reduction in salary is contractual and based on the Staff Council Manual.

However, Plaintiff, unable to return to work because she suffered from, and continues to suffer from, major depression and PTSD, was forced to continue

working in an environment where it was impossible to avoid her harasser, Foster, because they worked on the same floor, shared the same copy room, kitchen and secretaries.  PMG Tr 192:23-24 – 193:1-4 and 301:8-24. The UAW's failure to move the harasser, Foster, was effectively an adverse employment action because Plaintiff was forced to sit in her office, with the door locked, lights off, and blinds taped shut. Ex. 3 - PMG Tr. 174:21-224 – 175:1-4. Indeed, Plaintiff was told that Foster would not be moved and to avoid him, she could come in early and leave late; if she saw him coming, she could go in another direction; and if she needed copies, she could ask the secretary to make copies. Ex. 3 - PMG Tr. 193:5-11 and Shrock Tr. 118:3-14.  Plaintiff was also told that she had no choice but to see Foster and that she would have to remain professional.  Ex. 5 - Shrock Tr. 118:15-18.

This environment that the UAW created for Plaintiff was an adverse action against the victim and essentially a punishment for her even though Shrock acknowledged that Plaintiff had done nothing wrong. Ex. 5 - Shrock Tr. 114:3-10. This environment was not merely maintenance of the status quo but was entirely untenable and contributed to Plaintiff's depression and PTSD.  The UAW was aware that Foster had attempted to intimidate Plaintiff and that she feared him. Ex. 3 - PMG Tr. 201:6-20.  Yet she was told that she had no choice but to continue to see him. Additionally, the UAW terminated Plaintiff's healthcare benefits and she was

mysteriously removed from her husband's benefits also. PMG Decl. ¶ 8. The UAW's actions caused Plaintiff harm, mentally and also financially.

These adverse actions are the very reason why Plaintiff did not report the incidents of harassment when they occurred. During the April 17, 2019 meeting with Plaintiff, Shrock, Siddiqi and Andrews, Plaintiff indicated that she would not have brought the sexual harassment claim to their attention if "this is what was going to happen". Ex. 4-17-2019 Investigative Note to File p. 2. Plaintiff felt that it was done in vain and that she was being retaliated against and subjected to a hostile working environment. Ex. 4-17-2019 Investigative Note to File p. 2. Defendant's actions taken against Plaintiff after Foster's harassment had been reported and after the investigation were tantamount to punishing her just short of termination. In short, had Plaintiff not engaged in the protected activity of making a claim of sexual harassment against her supervisor, the Vice President of the Executive Board and a former vice president, she would not have been subjected to these adverse actions.

## II. The UAW is liable under ELCRA for the hostile work environment it cultivated.

The Michigan Elliott Larsen Civil Rights Act, MCL 37.2101, *et seq.* ("ELCRA") prohibits an employer from violating an employee's civil rights. Under the ELCRA, it is unlawful for an employer to discriminate against an employee "because of race, color, national origin, age, sex, height, weight, or marital status. MCL 37.2202(1). Discrimination on the basis of sex includes sexual harassment.

MCL 37.2103(i). Under the ELCRA sexual harassment means "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature" under conditions where, among other things,

> the conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment.

The Sixth Circuit has recognized that the "ELCRA hostile work environment analysis is identical to Title VII's analysis. *Wasek v. Arrow Energy Services, Inc.,* 682 F.3d 463, 468 (6th Cir. 2012). To establish a hostile work environment claim under ELCRA, a plaintiff must demonstrate the following:

> (1) that she belonged to a protected group; (2) that she was subject to communication or conduct on the basis of sex; (3) that she was subjected to unwelcome sexual conduct or communication; (4) that the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with her employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior. *Elezovic v. Bennett,* 274 Mich App 1, 7; 731 N.W. 2d 452 (2007).

"Respondeat superior liability exists when an employer has adequate notice of the harassment and fails to take appropriate corrective action". *Id.* "However, if an employer is accused of sexual harassment, then the respondeat superior inquiry is unnecessary because holding an employer liable for personal actions is not unfair". *Id.* at 8, *quoting Radtke v. Everett,* 442 Mich 368, 397, 501 N.W.2d 155 (1993).

28

"Whether a hostile work environment existed shall be determined by whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Elezovic* 274 Mich. App. at 16.

Here, there is dispute that Plaintiff has met the  respondent superior elements. Although Plaintiff's position is that Foster, Hardy and Kariem were agents of the UAW and showing the respondeat superior element is unnecessary, Plaintiff will address Defendant's baseless argument that they were unaware of the pervasive nature of harassment within the organization.

### A.  The UAW was Aware of the Harassment and Took No Action to Stop or Prevent it.

Contrary to Defendant's contention, there is no credible argument that the UAW was unaware of the harassment that existed within the organization. Defendant's argument that Plaintiff did not report the many incidents of sexual harassment is unpersuasive.  As Parker testified, "how do you report something to people that are present when it happens?".  Parker Tr. 98:1-6.  As early as 2008, Settles made unwanted comments regarding Plaintiff of a sexual nature to Gamble, i.e. "look at those nipples. I told you. She must be happy to see you".  Although Gamble, a director in a managerial position, saw that Plaintiff was embarrassed and told Settles, leave that girl alone, he did not report the incident to HR.

29

In 2010, Settles hosted a Christmas party for UAW where management employees, witnessed Settles pull Plaintiff by her ponytail and roll her down to where he was sitting, and ripped up turtleneck.  The AA apologized, but he never reported the incident to HR.

Contrary to Defendant's contention, the UAW maintained an environment that militated against reporting harassment.  Her fear of retaliation was a real fear (that turned out to be true) and rooted in the conduct of Defendants, which was shared by others, including Roivas and McNeil. McNeil also expressed a fear of retaliation when he witnessed Foster's harassment of Plaintiff but said nothing.

Despite the incidents of sexual harassment within the UAW, the UAW provided no sexual harassment training, after new hire orientation, that anyone can actually recall.  The Policy which Shrock and Siddiqi claim was distributed via email to the employees, was not received by Plaintiff and Parker testified that she did not receive it until sometime in 2018.

Also, when Hardy, a director and department head, was informed that Foster had kissed Plaintiff on the mouth, he did not report this incident to HR.  He did not speak to Plaintiff alone.  Instead, he convened an impromptu meeting, pulled her out of her union representative's office and questions Plaintiff in the presence of her harasser-supervisor.   Roivas expressed to Hardy that Plaintiff was upset, and he needed to report it to HR, to which Hardy replied "I don't care what she says, I don't

care how she feels, I want to keep this on this floor; I have to protect this man".
Roivas Tr. 44:18-25, 87:16-25.  Roivas Tr. 85:4-11 and 90:9-16.  Hardy did just that.
He protected Foster and did not care how Plaintiff felt.  In short, Hardy sought to
discourage her from reporting the harassment.

     This was a recurring theme with the UAW.  Hardy did not report or investigate
the harassment because he had to protect Foster.  Shrock's investigation was a sham,
and  anything but thorough.  Shrock did not include HR in his investigation, did not
interview the only eyewitness to the Foster's kiss assault of Plaintiff at BCBS, or
Tolbert who could have corroborated an allegation of sexual harassment going back
to 2008.  He also did not interview Felicia Browning who Plaintiff spoke to after the
kiss assault.  Incredibly, even after Shrock confirmed that Foster sexually harassed
Plaintiff, he prepared a recommendation to the UAW President and Chief of Staff
concluding that there was "an obvious misunderstanding" between Foster and
Plaintiff on the intent behind his actions. Dkt. 52-8, PageID.904.

     The UAW changing Plaintiff's reporting structure without changing her
environment so that she would not have to encounter Foster was not a remedial
measure.  Even after her reporting structure was changed, Foster would attempt to
intimidate Plaintiff by giving her angry looks.  PMG Tr. 196:3-7.  Plaintiff, unable
to work under those conditions any longer, went on medical leave eight days after
the "investigation" was concluded.

The inconvenient truth is supported by Roivas' testimony that there is a lot of sexism at the UAW. Roivas Tr. 24:25 – 25:1-20.

There was no discussion or consideration at all of moving Foster's office.  As the UAW indicated in their disciplinary notification, Foster was a valued employee. Although Plaintiff did nothing wrong, Foster has fared far better than Plaintiff. Unlike Foster, Plaintiff is unable to work due to depression and PTSD,  while Foster continues to enjoy all of the benefits denied to Plaintiff.

**III.    The UAW is not entitled to summary judgment on Plaintiff's Title VII hostile work environment claim because it was negligent in preventing sexual harassment**

     A.    Foster was Plaintiff's Supervisor

The ELCRA defines employer as "a person who has 1 or more employees and includes an agent of that person". MCL 37.2201. Most employers cannot function without delegating supervisory power, and "it is through this delegation of general supervisory power and authority that one becomes an 'agent' of the employing entity and, thus, an employer within the context of the CRA". *Elezovic v. Bennett,* 274 Mich. App. 1, 10; 731 N.W.2d 452 (2007).  An agent is a person "to whom the employing agency delegates supervisory power and authority over subordinates". *Id.* at  15.  Agents  are  "distinguished  from  co-employees, subordinates, or coworkers who do not have supervisory powers or authority". *Id.* at 10.  Agents have "influence and power over their victim that co-employees do not

enjoy, such as control over their victim's employment circumstances and opportunities like promotions, bonuses, overtime options, raises, shift and job assignments and termination. *Id.* at 12.

From March 18, 2018, through April 2029, Foster was Plaintiff's supervisor and Plaintiff directly reported to him. Foster Tr. 56:23-25 – 57:4-6. Contrary to Defendant's contention, Foster was in charge of and had control over all of Plaintiff's job assignments, her meetings, reports and everything related to her day-to-day work tasks. PMG Decl. ¶ 6. In short, Foster's position was not simply a meaningless title as Defendant's argue, but it empowered him with control over all aspects of her daily work activities which could significantly impact the conditions of her employment and to which Plaintiff had to adhere.

Defendants' argument is inconsistent with reality and the purpose of the ELCRA. Defendant wants this Court to believe that the UAW President is the sole individual in the entire UAW organization who has the power to take tangible employment against employee and, therefore, is the only person who could ever be liable for sexual harassment under ELCRA. It was Mike Stone, not the UAW President, who told Roivas that she had to either take the demotion to an International Representative position in the civil rights department "because they haven't had a Hispanic woman" there or be assigned to organizing. Ex. 11 - Rovias Tr. 51:7-25 – 52:1-11 and 53:20-24. Hardy, who apparently possessed some

33

authority, told Stone "don't do that, you can't do that to her". *Id.*, 5-18.   Further, when Plaintiff worked for and reported to Jimmy Settles, a managerial employee, Settles made it clear to Plaintiff that he could send her back to Blue Cross at any time.  PMG Tr. 242:1-14, 243:2-14, 245:12-19

Contrary to Defendant's contention, Plaintiff believed that Foster was her supervisor.  PMG Decl. ¶ 5.  He was not simply Plaintiff's co-worker.  She reported directly to Foster.  Foster was in charge of her daily work life, not just handing out assignments, and could substantially impact her working conditions.   McNeil also believed Foster was his supervisor because he testified that when Foster commented about bending Plaintiff over the desk, McNeil did not say anything to Foster "due to fear because Foster was his boss".  Ex. 10 – 4-5-2019 McNeil Interview Notes UAW_309.  Additionally, Roivas believed that Hardy was her supervisor/boss when she testified that although she herself was a manager, she had duty to report the case. She had a boss. She had a supervisor.  Ex. 11 -Roivas Tr. 21:16-25 – 22:1. Defendant's attempt to insulate itself and its management from liability for violating the civil rights of its employees should be rejected by this Court.

For the same reasons that Defendant is liable under ELCRA, Plaintiff is liable under Title VII for creating and maintaining a hostile work environment.  Plaintiff's claim that it maintained anti-harassment policies and provided multiple and alternative paths for reporting is belied by the testimony of its own investigator.

34

While Shrock listed ways in which an employee could report sexual harassment, he admitted that this is based on his own experience and not because it is written down in a policy. The notion that the UAW had a widely known and effective sexual harassment policy is belied by the testimony of Plaintiff who hesitated when asked if she knew how to report sexual harassment and never provided Shrock with any of the methods he claims a report can be made. Ex. 5 – Shrock Tr. 71:10-23 – 72:1-12.

For the same reasons Plaintiff did not report Foster or Settles, she did not report Kariem's sexually harassing conduct because he was the Vice President of the Executive board who wielded significant power. Plaintiff testified that she feared retaliation. PMG Tr. 319:1-24 – 320:1-19. The UAW knew or should have known of the harassment that was occurring within the organization. It should not be absolved of liability because a report was not made when they have created a culture **where employees were afraid to speak up for fear of retaliation.**

**IV.    The UAW is not entitled to summary judgment on Plaintiff's hostile-work environment based on relevant evidence of sexual harassment by Settles**

**A.    Plaintiff's claim for hostile work environment based on Settles' harassment of Plaintiff is not time-barred.**

Plaintiff recognizes that the filing a timely charge with the EEOC is a prerequisite to a Title VII claim. The Sixth Circuit employs the continuing violation doctrine in Title VII cases. *Sharpe v. Cureton,* 319 F.3d 259. 266 (6th Cir. 2003).

Where, as in this case, there is a continuing violation, "a plaintiff is entitled to have the court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice including those that would otherwise be time barred. *Id., quoting Alexander v. Local 496, Laborers' Int'l Union of North America,* 177 F.3d 394 (6th Cir. 1999). Hostile work environment claims under Title VII generally involve "unlawful employment practices that cannot be said to occur on any particular day but, occur over a series of days or years". *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 117 122 S. Ct. 2601, 153 E. Ed. 2d 106 (2002), *citing Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993)  "A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice". *Id.* As recognized by the Supreme Court:

> The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. *Id.*

Further, "where the facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim" *Weigel v. Baptist Hospital,* 302 F.3d

36

367, 380, 96th Cir. 2002). Additionally, "when an EEOC investigation of one charge *in fact* reveals evidence of a different type of discrimination against the Plaintiff, a lawsuit based on the newly understood claim will not be barred. *Davis v. Sanchez,* 157 F.3d 460, 463 (6th Cir. 1998) (emphasis in original).

In this case, Plaintiff timely filed her EEOC charge. As part of its investigation and at the EEOC's request, Plaintiff filed a rebuttal to the UAW's response detailing the harassment she endured from Settles, Kariem and Foster. Ex. 6 – EEOC Submission. The allegations in the complaint were also made to the EEOC. These allegations and instances of sexual harassment by Settles, Kariem and Foster were submitted to the EEOC and comprised a series of acts that collectively constitute an unlawful employment practice. In short, regardless of when the separate acts occurred, they

Here, Plaintiff's claims are comprised of separate acts of harassment Plaintiff endured over the years which together constitute one unlawful employment practice. The environment maintained by the UAW allowed men, including supervisors, managers, and directors to engage in sexually inappropriate conduct with no well-defined policy and process to report the conduct, sham investigations and ineffective "corrective actions" which did nothing to protect the victim. Then when a victim brings a civil suit against the UAW for violation of her civil rights by a supervisory or managerial employee, the UAW shields itself from liability with the argument

that no one other than the president has the authority to hire, fire, promote, demote, reduce, or cause a significant change in benefits. This court should not allow the UAW to escape liability.

Where claims involving events that occurred before the statutory period cannot form a basis for a lawsuit, under ELCRA and Title VII, "such evidence is relevant as background to put sexual harassment claim in context" and can, and should, be considered. *Marotta v. Ford Motor Co.,* 119 F. Supp. 3d 676, 688 (E.D. Mich. 2015). Therefore, any incidents of harassment by Settles that fall outside of the applicable statute of limitations for Plaintiff's ELCRA claims are relevant and can, and should, be considered when determining Defendant's liability.

For the same reasons that Defendant is not entitled to summary judgment on Plaintiff's hostile work environment claims as to allegations related to Settles, Defendant is not entitled to summary judgment on Plaintiff's claims against Kariem. Additionally, for the reasons discussed above, Plaintiff exhausted her administrative remedies as to Kariem. During the EEOC's investigation, Plaintiff submitted a detailed account of the sexual harassment she was subjected to by Kariem. Accordingly, Defendant's motion should be denied.

Whether the discriminatorily harassing conduct is severe or pervasive "is not susceptible to a mathematically precise test". *Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321, 333 (6th Cir. 2008). "Courts must look at 'all the circumstances,' including

'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance'. *Waldo v. Consumers Energy Co.,* 726 F.3d 802, 814 (6th Cir. 2013).

Kariem, who at all relevant times was either a director or the UAW Vice President, not only propositioned Plaintiff for sex, but he would call her cousin Plaintiff estimated maybe 100 times, because he had a cousin who was beautiful like her. PMG 210:2-16. When he called her "cousin" he was flirting and would shake his head when he saw Plaintiff. Ex. 3 - PMG Tr. 221:1-10 Kariem would make other inappropriate comments about Plaintiff's appearance like "goddamn you're so fine". Ex. 3 - PMG Tr. 223: 2-23.  In short, Kariem also sexually harassed Plaintiff, but her estimation more than 100 times over the years.  Since he was in a position of power, she was afraid to report his conduct.  Ex - PMG Tr. 222:3-12.

## CONCLUSION

For the foregoing reasons, Defendant UAW's Motion for Summary Judgment

or, in the Alternative, for Partial Summary Judgment should be denied.

Respectfully submitted,

/s/ Gerald K. Evelyn    _____
GERALD K. EVELYN (P29182)
Attorney for Plaintiff
300 River Place, Suite 3000
Detroit, MI 48207
(313) 962-3500
Dated: September 21, 2021              *geraldevelyn@yahoo.com*

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2021, attached document(s) were electronically filed with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

/s/Gerald K. Evelyn    _____

## CERTIFICATE OF COMPLIANCE

I, Gerald K. Evelyn, certify that this document complies with Local Rule 5.1(a), is double-spaced, except for quoted material and footnotes, the margins are at least one inch on the top, sides and bottom, each page is numbered consecutively, the type size of all text and footnotes are no smaller than 10 ½ characters per inch (non-proportional) or 14 point (proportional) and does not exceed the page limit set by this Court in its August 2, 2021 Order Dkt. 43.

/s/Gerald K. Evelyn
Gerald K. Evelyn

41