Morris-Gibson v. UAW, et al.
Case No. 2:20-cv-11346

Reply Brief in Support of Defendant UAW's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment
Supporting Documents

# Exhibit 17
# Jimmy Settles Deposition Transcript Excerpts

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION

                              * * *

PATRICIA MORRIS-GIBSON,
an individual,


               Plaintiff,
                                    Case No. 2:20-11346 MAG-APP
vs.                                 Hon. Mark A. Goldsmith

THE INTERNATIONAL UNION, UNITED
AUTOMOBILE AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA, (UAW), GERALD KAREEM,
MIGUEL FOSTER and GEORGE HARDY,

               Defendants.
_____/
```

                          THE DEPOSITION OF JAMES SETTLES

                          The Deposition of JAMES SETTLES,

taken before Judith Halprin, CSMR-3202, Certified Court

Reporter and Notary Public for the County of Oakland, Acting

in the County of Wayne, State of Michigan, at 300 River Place,

Suite 300, on Wednesday, July 28, 2021, commencing at or about

the hour of 2:20 o'clock, p.m.

```
APPEARANCES:           GERALD K. EVELYN, ESQUIRE
                       300 River Place, Suite 3000
                       Detroit, Michigan 48207
                       Appearing on behalf of the Plaintiff.

                       LISA GARDNER, ATTORNEY AT LAW
                       Williams Acosta, PLLC
                       300 River Place, Suite 3000
                       Detroit, Michigan  48207
                       Appearing on behalf of the Plaintiff.
```

                * * * CONTINUED ON FOLLOWING PAGE * * *

**Page 2**

APPEARANCES, CONT.:   ABIGAIL V. CARTER, ATTORNEY AT LAW
ADAM BELLOTTI, ESQUIRE
(VIA ZOOM)
805 Fifteenth N.W., Suite 1000
Washington, DC  20005
Appearing on behalf of the Defendant, UAW.

WILLIAM P. ZIEGELMUELLER, ESQUIRE
Schiff Hardin, LLP
350 South Main Street, Suite 210
Ann Arbor, Michigan  48104
Appearing on behalf of Miguel Foster.

REPORTED BY:   JUDITH HALPRIN, CSMR-3202
Judith Halprin Court Reporting & Video
Telephone:  248.851.3332

**Page 3**

              I N D E X
WITNESS                                      PAGE
  JAMES SETTLES
Direct Examination by Mr. Evelyn              7
Cross-Examination by Ms. Carter              81
Redirect Examination by Mr. Evelyn           86

              * * * * *

EXHIBITS                              PAGE # MARKED
Deposition Exhibit A                          8
   (Notice of Taking Deposition)
Deposition Exhibit B                         28
   (Policy on Elimination of Work Place Sexual Harassment)

**Page 4**

1    Detroit, Michigan
2    Wednesday, July 28, 2021
3    At about 2:20 o'clock, p.m.
4         * * *
5    J A M E S  S E T T L E S,
6  having been first duly sworn by the Notary Public to
7  tell the truth, the whole truth, and nothing but the
8  truth, testified upon her oath as follows:
9         MS. CARTER:  Sorry, this is Abigail
10 on the line.  I can't tell who is in the room.  Who is
11 in the room? Gerald, could we do -- could we do a round
12 robin?
13        MR. EVELYN:  Okay.  Can you do a
14 round robin?
15        COURT REPORTER:  Obviously I am in
16 the room, Abigail.  Bill is here.  Lisa, Mr. Evelyn and
17 myself.
18        MS. CARTER:  Is there any other
19 lawyer?
20        MR. EVELYN:  No.
21        MS. CARTER:  Okay.  Hi, I am Abigail
22 Carter, with my colleague, Adam Bellotti on screen.  We
23 are here on behalf of Defendants UAW, Gerald Kariem and
24 George Hardy.
25        THE WITNESS:  Pleased to meet you.

**Page 5**

1         MR. EVELYN:  Are we ready?  Anything
2  else, Abigail?
3         MS. CARTER:  Not at the moment.
4         MR. EVELYN:  Okay.  All right.
5  Mr. Settles, as I told you this morning my name is
6  Gerald Evelyn, and I and Lisa Gardner are two of
7  Patricia Morris-Gibson's lawyers in this lawsuit.
8         Today is the date for your
9  Deposition.  Have you ever had a Deposition taken
10 before?
11        THE WITNESS:  I don't think so.
12        MR. EVELYN:  Okay.  I'm going to go
13 over just a couple of ground rules.  You've been sworn,
14 so you're testifying under oath.  I'm going to ask you
15 some questions.  The other lawyers may ask you questions
16 or not, the ones that are remote.  Abigail and Adam,
17 will certainly ask you questions when I'm done.
18        When I ask you a question, first of
19 all, make sure you understand it.  Otherwise, when you
20 answer the question, we'll assume that you understood
21 the question.
22        If the question is not clear to you,
23 or if you're in any way hesitant about understanding
24 what was meant by the question, then you just tell me
25 that, to rephrase the question, or clarify it and that's

**Page 42**

1  A   They participate in a lot of places, not just the TULC.
2  Q   Okay. I'm just using that as an example as one.
3  A   We're not -- to answer your question, it is something
4      the UAW sponsors. TULC is a club, a Trade Union
5      Leadership kind of club, where anybody, not only UAW
6      people, not only Union people, politicians, regular
7      people, anybody.
8  Q   And the UAW people participate in TULC, too. Is that
9      correct?
10 A   Yes.
11              MS. CARTER: Objection to form.
12 BY MR. EVELYN:
13 Q   What about the Coalition by Trade Unions?
14 A   The same thing. I mean that's just what it says. It's
15     a Coalition of Trade Unions, and UAW is part of the
16     coalition.
17 Q   Right. They have social activities, also, though.
18     Right?
19 A   Oh, yes.
20 Q   And let me ask you about the Plaintiff,
21     Patricia Morris-Gibson. Do you know her?
22 A   Yes, I do.
23 Q   And how long have you known her?
24 A   I don't know the exact time, but I met her when I had
25     Blue Cross and Blue Shield. She was a negotiator, and

**Page 43**

1      my staff, and we negotiated the first contract that I
2      ever did with them. So I came in at the end, as we
3      normally do when you're a Vice President, to close the
4      deal out, myself and the head negotiator from Blue
5      Cross.
6  Q   Do you recall when you first met her?
7  A   That's what I'm talking about right now.
8  Q   Did you first meet her when you were Director of
9      Region 1A?
10 A   No.
11 Q   What was your title when you first met her then?
12 A   Vice President of the UAW, and I was like the first guy
13     elected to the Vice President in 2-0-6.
14 Q   You were Director of Region 1A, and do you remember
15     attending a Civil Rights conference in Atlanta, Georgia
16     while you were Director of Region 1A?
17 A   In 2-0-2, yeah, I probably did. I don't know in 2-0-2.
18 Q   Now do you recall that that was where you first met
19     Miss Morris-Gibson?
20 A   I just told you where I first met her.
21 Q   So you didn't first meet her while you were at that
22     conference?
23 A   That's correct.
24 Q   Okay, and do you know Reggie Mills?
25 A   Yes, I do.

**Page 44**

1  Q   And who is Reggie Mills?
2  A   He's a National Representative.
3  Q   And how long have you known Reggie Mills?
4  A   Oh, probably since 1980 or something like that.
5  Q   And you don't recall being at a bar in Atlanta, Georgia,
6      and asking Reggie Mills to tell Miss Morris-Gibson to
7      come over and have a drink with you?
8  A   No.
9              MR. ZIEGELMUELLER: Object to form.
10             THE WITNESS: No. To have a drink,
11     no. If I'm going to ask somebody to do that, I'm going
12     to do it myself.
13 BY MR. EVELYN:
14 Q   Well, if you didn't know someone, and you thought
15     somebody else knew them, that might be a way to suggest
16     to invite her though, isn't it?
17             MR. ZIEGELMUELLER: Object to form.
18             THE WITNESS: I don't act that way.
19 BY MR. EVELYN:
20 Q   Okay, so that never happened? You never asked Reggie
21     Mills to bring over Miss Morris-Gibson to meet you. Is
22     that right?
23 A   That's correct.
24 Q   And you never bought her a drink in Atlanta at that
25     time?

**Page 45**

1  A   I may have bought everybody a drink. I mean her just
2      personally, just no, no.
3  Q   Do you recall meeting her at the Civil Rights conference
4      in Atlanta, Georgia?
5  A   The same answer.
6  Q   Does that mean you have, but you just don't remember?
7  A   It's not that I may have or just don't remember. I told
8      you the first time you asked me, the first time I
9      actually remember meeting her is when we had
10     negotiations, and she was part of the negotiating team,
11     and I can't remember if it was 2-0-6, 2-O-7, 2-8, but
12     during hat time frame because I had first got elected
13     and we had Blue Cross.
14 Q   Okay, so if Miss Morris-Gibson says that you met her in
15     Atlanta, that's not your recollection. Is that right?
16 A   That's correct.
17             MR. ZIEGELMUELLER: Object to form
18     and foundation.
19 BY MR. EVELYN:
20 Q   And if she said that you offered to buy her a drink and
21     she refused, and that's not you recollection. Right?
22 A   That's correct.
23 Q   Do you recall seeing Miss Morris-Gibson at Macy's Bar on
24     Black Lake?
25 A   When?

Page 46

1  Q   At anytime?
2  A   Anytime?
3  Q   Yes.
4  A   You're talking 2-O-6 to 2 -- okay. Give me the exact.
5      She worked on my staff. After negotiations, I needed
6      somebody to do Blue Cross, and I interviewed her, and
7      she worked for me at that particular time. That's --
8      other than -- and the negotiations, that was the first
9      time I seen her, and then I called in, and -- because I
10     liked the way she handled herself during negotiations.
11         It was a very hard fought
12     negotiation. We had a hard time getting the Agreement
13     passed, and she did a -- in my opinion, a Yeoman's job,
14     so I offered her a position to the International Union.
15 Q   And what was that position that you offered her?
16 A   International Rep.
17 Q   And did she accept the position?
18 A   Yes, she did.
19 Q   And that was what year?
20 A   I can't remember. I don't know. It was the first -- I
21     don't know if it was 2-6 or 2-08. It got to be in
22     there because when I first got the department.
23 Q   As Vice President, did you ever have TOP in your
24     portfolio?
25 A   That's what I had in 2-06. Blue Cross, when I -- in the

Page 47

1      State of Michigan, they follow what we call the TOP,
2      Technical Office Professionals, so I had all the TOP.
3  Q   Do you ever remember being at Macy's Bar in 2-06 or
4      2-07, and Miss Morris-Gibson was present there, and you
5      offered to buy her a drink?
6  A   No. If I wanted -- sorry, I'm tired of saying this
7      because I read these allegations.
8  Q   Okay.
9  A   You know, and that's why asking for years, because I
10     consider her a staff, you know, and even some stuff, the
11     department come up with later, came in to interview,
12     when you ask people -- when you ask people to come on
13     staff, you let them know what they have to do.
14         A lot of people come on staff and
15     they do one job, that's it, and I want people to make an
16     honest decision, is this what they want to do. Not get
17     the job and quit because they give up the job. So when
18     you're talking 2-06, yeah, some -- probably sometime
19     after that she went to a staff with me, accompany me.
20         We go to Macy's, and, you know, we
21     do, you know, buy drinks. We have tickets that we give
22     people because we have to monitor. We don't want people
23     to be drinking too much, and we buy up tickets.
24         So, anyway, I'm trying to answer
25     your question. It may not make sense to you, but it

Page 48

1      makes a whole lot to me. That's why I had to tell you
2      that.
3  Q   I follow you. I just -- and maybe it will make it
4      easier for me ask my questions.
5  A   Okay.
6  Q   Did you read the allegation in the Complaint?
7  A   Yes, sir.
8  Q   Let's turn to the allegation where she says that while
9      you were at Black Lake, and she was there at Macy's Bar,
10     you offered her to buy her a drink and you ran your
11     hands across her stomach and asked her if you could,
12     quote, have some. Did that happen?
13 A   No, it did not happen.
14 Q   Okay. Did anything like that ever happen?
15 A   It never happened.
16 Q   And so you didn't have -- that didn't happen, and you
17     didn't say afterwards that you were just kidding?
18 A   That's correct. Did she say what year that was?
19 Q   Well, you said it never happened. It really doesn't
20     matter what year, does it?
21 A   No, it doesn't, but I'm trying to prove -- well, that's
22     okay. I'll just answer the question. I'm sorry.
23 Q   You've indicated that you thought Miss Morris-Gibson did
24     a good job in the negotiations, and that's why you asked
25     her to come on your staff. Is that right?

Page 49

1  A   That, yes, and I was looking for someone because that
2      was something I was totally unfamiliar with. We only
3      had one person on that staff that knew anything about
4      TOP, and that she did a good job, yes. You're
5      absolutely right.
6  Q   Did you ever see Miss Morris-Gibson at a caucus meeting
7      at TULC?
8  A   A caucus meeting? What kind of -- no. I don't know
9      what you're talking about. I don't know what year a
10     caucus meeting -- a caucus about what?
11 Q   Did you ever tell her that you had been watching her and
12     you thought she handled the weekly meetings very
13     effectively?
14 A   No, no. This is -- you're talking TULC, I mean the
15     reason where I am today is because of Buddy Battle and
16     Shepherd, and the rest of them did that. The place was
17     ran down, and I took it upon myself to raise money in
18     order to bring it back up to scope. She is one of the
19     ones, and some others that went down there to help, and
20     to --
21 Q   Was that at your behest? Did she go over there because
22     -- on her own, or did you --
23 A   No, no. Everybody that knows me know that I -- that I
24     care about that because the people that actually started
25     it, they started it for the community. They started

**Page 54**

```
 1  Q   And that's kind of part of the network of development
 2      and evolution.  Is that correct?
 3  A   That's correct.
 4  Q   In that organization, right?
 5  A   Yes.
 6             MS. CARTER:  So sorry.  It's really
 7      hard, particularly on a Zoom, to be able to sort of
 8      interject, so Mr. Settles, so if you wouldn't mind, and
 9      try not speaking over Mr. -- speaking over Gerald.  If
10      you could just take a quick breath, and so I can get an
11      objection because I don't want to talk over you and I
12      don't want to talk over Gerald, and I also want to get a
13      record.
14             THE WITNESS:  Okay.
15             MS. CARTER:  Thanks everybody.
16             MR. EVELYN:  Okay, and I'm just
17      trying to capture what you're saying, and if I misstate
18      it, you're good at correcting people if they say the
19      wrong thing.  Right?  So you correct me.  Feel free to
20      do that.
21             Back to Kevin Tolbert.
22  BY MR. EVELYN:
23  Q   You say Kevin Tolbert was an International Rep.  Is that
24      correct?
25  A   Yes, it is.
```

**Page 55**

```
 1  Q   Would he fit into the category of people that you've
 2      mentored, would you say he's a --
 3  A   Yes.
 4  Q   Person that you mentored -- okay, and how long have you
 5      known him?
 6  A   About twenty years.
 7  Q   And you would consider him to be a friend?
 8  A   Yes.
 9  Q   And have you helped him advance his career at all in the
10      UAW?
11  A   Yes.
12  Q   In what respect?  I need you to give me some examples is
13      all I'm asking, the ways you've helped him.
14  A   Talking to him, tell him what he should do, should not
15      do.
16  Q   Gave him some -- tried to give good advice?
17  A   Tried to, yes.
18  Q   Did you suggest that he apply for certain positions?
19  A   Apply?
20  Q   Apply for certain jobs in the UAW.
21  A   It doesn't necessarily work like that.  When he worked
22      for me, I promoted him.
23  Q   Okay.  You promoted him.  Okay.  What jobs did he have
24      under your administration?
25  A   First he worked on -- with Blue Cross Blue Shield, when
```

**Page 56**

```
 1      he came on staff.  He worked with Aerospace, and he
 2      worked in the Ford Department, and he worked in Advanced
 3      Manufacturing, and at one time he was over the Training
 4      Center.
 5  Q   At one time he was over the Training Center?
 6  A   That's right.
 7  Q   Do you remember when that was, if you do?
 8  A   '13, '14.
 9  Q   Was Miguel Foster ever over the Training Center?
10             MR. ZIEGELMUELLER:  Objection,
11      foundation.
12             THE WITNESS:  No, not Ford.
13  BY MR. EVELYN:
14  Q   Okay.  He was Chrysler, right?
15  A   Yes.  I believe so.
16  Q   Did you ever ask Kevin Tolbert if he was sleeping with
17      Patricia Morris-Gibson?
18  A   No.
19  Q   How would you describe Miss Morris-Gibson's work ethic?
20      Was she a hard worker?
21             MR. ZIEGELMUELLER:  Object to form.
22             THE WITNESS:  Yes.
23  BY MR. EVELYN:
24  Q   Did you ever have any problems with her performance, as
25      an employee doing her job?
```

**Page 57**

```
 1  A   Not really.
 2  Q   Was there ever a situation where you asked -- you were
 3      in a meeting with Rory Gamble and you asked
 4      Miss Morris-Gibson to bring Mr. Gamble a bottle of
 5      water?
 6  A   If it happened, my secretary -- you know, you have water
 7      in the refrigerator, and we was out of water, so I
 8      asked my secretary if she can get a water for Rory
 9      Gamble because we were in a meeting, and so she must
10      have went to Pat, Patricia to get a water, and Patricia
11      brought it in.
12  Q   Do you remember when that was?
13  A   It had to be eight, nine years ago.
14  Q   And did you remark to Mr. Gamble that see how hard her
15      nipples are protruding through her shirt?
16  A   Absolutely not.  What I did say is -- I said, oh, she
17      must have -- I said she must have knew you were coming.
18      She was dressed real nice, and that's it.  I would never
19      say that to anybody.  I wouldn't say that to my wife.
20  Q   You just said she must have known you were coming to
21      Mr. Gamble.  Is that correct?
22  A   Yes.
23  Q   Okay, and was Miss Morris-Gibson in the room when you
24      said that?
25  A   Yes, she was.
```

Page 58

1  Q  Did she comment at all?
2  A  No.
3  Q  And you never told her later that Mr. Gamble was sorry
4     that --
5  A  No.
6  Q  Because of the remarks she alleged that you made.
7     Right?
8  A  No.
9  Q  The remark about her nipples protruding through her
10    shirt?
11 A  I said I never said that.
12 Q  Right. I get that, but I'm asking a different question.
13    So you would -- since you never said it in the first
14    place, the remark about her nipples protruding in her
15    shirt, you would never have had to apologize for that --
16 A  That's right.
17 Q  Because you're saying you didn't say it. Right?
18 A  That's correct.
19 Q  And did you say anything about what Rory Gamble said to
20    her later?
21 A  No.
22 Q  Was there ever a conversation with Miss Gibson where she
23    told you that she wouldn't mind working with Cindy
24    Estrada?
25 A  Okay, this is what happened. In -- and I was trying to

Page 59

1     explain to you every four years, we get new assignments.
2     I lost Blue Cross in 2010, and her and anybody else I
3     knew in the department I said, hey, you know what, if
4     you're ever dissatisfied, whatever place, just let me
5     know and I'll see if I can get you back, and work with
6     me in another department.
7  Q  Okay, so I'm trying to figure out how that relates to
8     my question. In connection with your answer that you
9     just gave, did Miss Morris-Gibson ever say she wouldn't
10    mind working with Cindy Estrada?
11 A  She said she was happy with where she was at, that's
12    correct.
13 Q  Is that a yes?
14 A  Yes.
15 Q  And did you -- did that upset you when she said that?
16 A  No.
17 Q  And so you didn't use blue language and say, mother
18    fucker, shut the fuck up and learn to appreciate when
19    somebody is trying to do something for you?
20 A  No.
21 Q  Is mother fucker a term that you used at work sometimes?
22 A  Not in front of a female.
23 Q  Not in front of women?
24 A  That's right.
25 Q  And so you never referred to Miss Morris-Gibson as

Page 60

1     mother fucker?
2  A  No. I never did that.
3  Q  Okay. Let me ask you do you ever recall, in connection
4     with this TULC activities, summoning Miss Morris-Gibson
5     to TULC when Kwame Kilpatrick, the former mayor was
6     there?
7  A  No.
8  Q  Is that no?
9  A  That's no. Yes, I'm sorry. No.
10 Q  And so you never called her late at night one time and
11    said get down here, Kwame Kilpatrick is going to be
12    going to TULC, and you want him to see a pretty face?
13 A  No.
14 Q  You mentioned golf outings earlier. Did you ever ask
15    Miss Morris-Gibson to bring some of her girlfriends to
16    the golf outings to help make it successful?
17 A  No.
18 Q  You never told her to bring some of your pretty friends
19    to these golf outings, I want people to come?
20 A  No. To golf.
21 Q  To the golf outing.
22 A  Uh-huh. No.
23 Q  She did attend some of the golf outings. Is that
24    correct?
25 A  Yes.

Page 61

1  Q  And did she --
2  A  Because she's on staff.
3  Q  Right.
4  A  And most people on staff would come out to the golf
5     outing, and, you know, help out.
6  Q  And that was one of the reasons she would come was to
7     come to help out. Is that correct?
8  A  If she wanted to. Because they had to take a vacation
9     day. If they don't want to come, they don't come and
10    they don't take a vacation. Nobody's mandatory to do
11    that.
12 Q  And so nobody got pressured to do that?
13 A  Nobody.
14 Q  Okay.
15 A  It was during the week, so it's normally done -- you
16    know, off a work week, a work day.
17 Q  Okay. Let me ask you about your Chelette Smiley. Do
18    you know Chelette Smiley?
19 A  Yes, I do.
20 Q  Who is Chelette Smiley?
21 A  She works for the Blue Cross. A very good friend of
22    Patricia.
23 Q  Did you ever see her at a CBTU conference in May of 2015
24    or 2016?
25 A  '15 or '16, yes. Probably. Yeah, I probably saw her.

**Page 66**

1  A  No, I didn't.
2  Q  So you didn't offer to buy her a drink as an apology?
3  A  No.
4  Q  Okay.
5  A  To buy a drink as an apology?
6  Q  As an apology. You didn't apologize to her for anything
7     the next day?
8  A  No.
9  Q  You didn't apologize for your behavior being
10    inappropriate to you?
11 A  No.
12 Q  Okay. Do you recall speaking to Miss Smiley at all
13    later in that conference?
14 A  You know, I can't remember. If she saying it's CBT.
15    I'm thinking -- no. You might be talking about
16    something ten years ago.
17 Q  I referenced 2015, 2016.
18 A  Okay. No.
19 Q  The event that you described, where do you remember it
20    from?
21 A  I thought it was in Washington D.C. You know, I --
22    yeah.
23 Q  Washington D.C. In what year?
24 A  I don't know the year. That's why I'm saying it was
25    awhile ago, and, you know, I can't remember. I mean --

**Page 67**

1  Q  Let me ask you, do you remember having a Christmas
2     party, a Ford Christmas party in 2010 that you hosted
3     for your staff?
4  A  I have one every year, 2010.
5  Q  And it was an alcoholic party I take it. Right, those
6     ones you ran?
7  A  Yeah. No, it was actually downstairs. We have a
8     Christmas party. I think we might have beer and wine.
9  Q  Downstairs where?
10 A  I'm sorry. It's in the building. It's downstairs in
11    the conference room over here, and I have the office,
12    and the conference room, and the Training Center
13    upstairs, and, you know, sometimes -- well, actually we
14    do. If I have some liquor, the guys come upstairs and
15    we drink. We have a drink up there, but not downstairs.
16 Q  So they drink upstairs, but not downstairs where the
17    party is?
18 A  Yeah. I think we might have beer and wine, but not any
19    hard alcohol.
20 Q  Not hard liquor?
21 A  Yes.
22 Q  And where would the hard liquor be upstairs? In your
23    office, or --
24 A  Yeah. In the office, and there's a conference room,
25    and we fit it in the drawer and stuff like that.

**Page 68**

1  Q  And this is a party during the day?
2  A  Yes, sir.
3  Q  So like maybe at lunch you start partying, the second
4     half of the business day?
5  A  Usually it's later, yeah.
6  Q  Do you recall an incident where you pulled
7     Miss Morris-Gibson on to your lap?
8  A  No.
9  Q  And did that ever happen?
10 A  It never happened.
11 Q  And she didn't -- you didn't end up grabbing her by her
12    ponytail?
13 A  Never.
14 A  And you didn't end up tearing her shirt?
15 A  No.
16 Q  And --
17 A  We got Security. No, no. To answer your question no.
18 A  Okay, and no one had to tell you to calm down? You can
19    answer that, that you grabbed by her ponytail, and later
20    grabbed her by the shirt?
21 A  I didn't do it.
22 Q  And you deny that ever happened?
23 A  That's right. I deny that ever happened, no.
24 Q  And you never had to apologize to her because you say it
25    never happened. Right?

**Page 69**

1  A  No.
2  Q  Do you know Felicia Browning?
3  A  Yes, I do.
4  Q  And who his Felicia Browning?
5  A  A friend of Patricia.
6  Q  Do you ever recall being at a meeting -- well, was
7     Miss Felicia Browning present at Local 1781?
8  A  Yes. One of the Locals I think, yeah.
9  Q  And were you ever at Friday's in Southfield with
10    Miss Morris-Gibson and Miss Browning?
11 A  Friday's in Southfield, not that I remember, no. When
12    was this?
13 Q  In 2016. I'm sorry, 2014.
14 A  No, I don't remember that.
15 Q  And do you recall cursing at Miss Morris-Gibson and
16    threatening to replace her with somebody else?
17 A  No.
18 Q  That didn't happen?
19 A  No.
20 Q  Do you ever remember being at Friday's in Southfield
21    with Miss Morris-Gibson and Miss Felicia Browning?
22        MR. ZIEGELMUELLER: Objection, asked
23    and answered.
24        THE WITNESS: I may be -- I don't
25    know. I mean seven years ago. I don't ever -- no. I

**Page 86**

1  A  Yes, it is. Yes, I was.
2  Q  At the time that you placed that call, did you know
3     anything about whether -- did you know anything about a
4     potential investigation into sexual harassment
5     allegations brought either by or on behalf of
6     Miss Morris-Gibson?
7  A  No, no.
8  Q  At the time that you placed that call, did you know
9     anything about an investigation into Miguel Foster?
10 A  No.
11 Q  In connection to actions towards Miss Morris-Gibson?
12 A  No. I was -- no.
13 Q  And when was the first time that you learned that
14    Miss Morris-Gibson was alleging that you had said or
15    done inappropriate things to her?
16 A  I think it was May or June of 2020, when John Roach, who
17    worked for Mayor Duggan. Well, actually the mayor
18    called me, and said he had John Roach call me who sent
19    me the mayor's Complaint.
20        MS. CARTER: I have nothing further.
21        MR. EVELYN: Some follow-up.
22        R E C R O S S - E X A M I N A T I O N
23 BY MR. EVELYN:
24 Q  You said that you the mayor called you first when the
25    lawsuit was filed?

**Page 87**

1  A  Yes.
2  Q  And what did Mayor Duggan say to you?
3  A  I had called the mayor because somebody was trying to
4     get in touch with him. A judge was trying to get in
5     touch with him, so I called the mayor, and the mayor
6     called me, and he said -- and I was telling him about
7     what's happening, and he said do you know that
8     something is going to come out in the press about you,
9     and I said what, and he said no -- I said, no, I didn't,
10    and he said, yes, John Roach just called me and I
11    thought -- he thought that's the reason why I was
12    calling him, and I said no, I don't know anything about
13    it, because I was actually in Florida, and then he said,
14    well, I'm going to have John Roach call you. So after
15    we talked about it, and we took care of business, and we
16    talked about it, and John Roach called me, and he said
17    I'll send you a copy of it.
18 Q  And just for the record, John Roach's position with the
19    city was at the time?
20 A  He was the Press Secretary.
21 Q  Press Secretary, right.
22        MR. EVELYN: Okay. All right.
23    That's all. Thank you.
24        MS. CARTER: I'm done.
25        Bill?

**Page 88**

1        MR. ZIEGELMUELLER: Nothing.
2  (Whereupon at about 4:25 o'clock, p.m., the
3     Deposition was concluded.)
4                    * * *

**Page 89**

CERTIFICATE OF NOTARY PUBLIC
STATE OF MICHIGAN )
                  )
COUNTY OF OAKLAND )

I, JUDITH HALPRIN, a Notary Public within and for the County of Oakland, State of Michigan, do hereby certify that the witness whose attached Deposition was taken before me in the entitled cause, was sworn to testify the truth, the whole truth, and nothing but the truth; that the testimony contained in said Deposition was taken by me by means of Stenomask; that said testimony was thereafter reduced to written form and that the said Deposition is a true and correct transcript of the testimony given by said witness.

I do further certify that I am not connected by blood or marriage to any of the parties, or their attorneys or agents; that I am not an employee of any of them; nor am I interested directly or indirectly in the matter in controversy either as counsel, agent, attorney or otherwise.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal at West Bloomfield, County of Oakland, State of Michigan, this 28th day of September, 2021.

/s/Judith Halprin
Judith Halprin, CSMR-3202
Notary Public, Oakland County, Michigan
My Commission Expires: 12/18/2027